The PEOPLE of the State of
Colorado, Petitioner

v.

Allen Charles BERGERUD, Respondent.

No. 08SC936.

Supreme Court of Colorado,
En Banc.

Jan. 11, 2010.

Rehearing Denied Feb. 16, 2010.*

Coats, J., filed a dissenting opinion in which
Rice and Eid, JJ., joined.

* Justice Rice, Justice Coats and Justice Eid would grant the petition.

John W. Suthers, Attorney General, Paul Koehler, First Assistant Attorney General, Denver, CO, Attorneys for Petitioner.

Samler and Whitson, P.C., Eric A. Samler, Denver, CO, Attorneys for Respondents.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

The People appeal the court of appeals' determination that Allen Charles Bergerud was denied his constitutional right to counsel and so is entitled a new trial. *See People v. Bergerud,* 203 P.3d 579 (Colo.App.2008).

Bergerud was charged with two counts of first degree murder. His court-appointed lawyers indicated in their opening statements that they would endeavor to show that Bergerud—due to various medical and psychological conditions as well as high levels of intoxication—had not acted with deliberation in killing the two victims, and so should not be convicted of first degree murder. Upon hearing these opening statements, Bergerud

requested new counsel on the basis that his attorneys refused to pursue and present the self-defense theory he desired. The trial court denied his motion, and Bergerud elected to proceed to trial pro se in order to argue his theory of self-defense. He was subsequently convicted.

On appeal, Bergerud claimed the content of his lawyers' opening statements and the denial of his motion for substitute counsel violated his constitutional right to representation. The court of appeals, reasoning that his lawyers' statements to the jury were tantamount to a guilty plea to lesser homicide offenses over Bergerud's objection, remanded the case for a new trial. We granted the People's petition for certiorari to consider whether Bergerud's right to counsel had been improperly denied.[1]

Because Bergerud decided to proceed pro se after voicing his disagreement with his court-appointed attorneys, the central question before us is whether Bergerud's waiver of his right to counsel was knowing, intelligent, and voluntary. That question in turn depends on whether his attorneys' trial decisions violated Bergerud's trial rights, thus forcing him to choose between his right to counsel and protecting other rights associated with his defense, such as the choice to testify or enter a plea of not guilty. Although defense counsel is free to develop defense theories based on reasonable assessments of the evidence, as guided by her professional judgment, she cannot usurp those fundamental choices given directly to criminal defendants by the United States and Colorado Constitutions. Although we conclude that Bergerud's lawyers did not violate his right to enter a plea, it is unclear on the record before us whether they wholly deprived him of his right to testify, or if they failed in their duty to investigate possible defenses due to a complete breakdown in communications. Either such violation would have undermined the voluntary nature of Bergerud's waiver of his right to counsel.

Accordingly, we reverse the opinion of the court of appeals and direct further specific inquiries consistent with this opinion.

## II. Facts and Procedural Posture

Bergerud was charged with capital murder for killing his ex-girlfriend and her male companion, as well as two counts of first degree assault on a police officer. During the incident, Bergerud shot both victims, and then exchanged gunfire with police officers before being shot in the hand, apprehended, and placed under arrest.

At the first of what would be two trials, Bergerud's hired attorney argued that Bergerud had not acted with the requisite mental state of deliberation and so could not be convicted of first degree murder. To this end, defense counsel highlighted Bergerud's very low IQ test scores and his intoxicated state at the time of the killings. The jury was not given instructions concerning lesser included offenses. Faced with an all-or-nothing choice between conviction for first degree murder or acquittal, the jury was unable to reach a consensus. It was dismissed as deadlocked after several days of deliberations.

Subsequently, the prosecution withdrew its request for the death penalty. Bergerud's original attorney was excused as Bergerud could no longer afford his fees, and the court appointed Bergerud new counsel. Prior to the beginning of his second trial, the trial court held several hearings on pre-trial motions where it was apparent that court-appointed counsel intended to adopt a similar trial strategy to that employed in the first trial. During voir dire, Bergerud's new attorneys continued to focus on evidence related to his mental state at the time of the killings, concentrating on jury members' history with mental illness and addiction, and

---

1. We granted certiorari on two issues:
 1. Whether criminal defendants have a fundamental constitutional right to direct their counsel to present an "innocence-based defense," irrespective of counsel's professional judgment.
 2. If there is such a constitutional right, what procedures should this Court devise to ensure

 that defendants are aware of said right, any waiver of it is done in a knowing, voluntary, and intelligent manner, and that counsel is acting pursuant to the defendant's directions and not on the basis of his own professional judgment.

asking about their ability to take evidence of those things into account when making their final determination.

Also consistent with this choice of defense, the opening statements offered by Bergerud's new attorneys at the beginning of the second trial focused largely on Bergerud's low IQ, his diabetes, and his intoxicated state at the time of the killings. Additionally, his lawyer stated that Bergerud was so confused he likely did not know or accurately remember what happened on the night of the killings. After opening statements, Bergerud requested that he be allowed to talk to the judge.

In chambers, Bergerud stated that he wanted to fire his attorneys because they refused to develop and present his defense as he requested and asked that a new opening statement be given. The trial court, upon hearing of the disagreement between Bergerud and his attorneys, suspended the trial to allow adequate time to investigate the matter. The trial court then excused the prosecuting attorneys for the afternoon while it held a series of in camera proceedings to inquire into the nature of the conflict between Bergerud and his lawyers. Bergerud explained that his first attorney had written him a letter lamenting the choice not to pursue a theory of self-defense. Trusting his first attorney's determination, Bergerud gave the letter to his court-appointed counsel for his second trial and asked them to present self-defense. According to Bergerud, his new attorneys refused to pursue the theory as it would "take too much work" to develop it. Bergerud complained that his attorneys were "not listening to the information that [he gave] them" and that they were "paying no attention to what [he was] telling them happened that night."

Bergerud's attorneys, though given the opportunity during these proceedings, never commented on the nature of their disagreement with their client nor gave an account of their reasoning on pertinent issues concerning the development of Bergerud's defense. They merely clarified that they did not intend, at that time, to move to withdraw as Bergerud's attorneys.

The trial court advised Bergerud that he was free to testify as to his recollection of the events, and that if evidence were presented to the jury regarding self-defense, the trial court would give the jury an instruction on that defense theory. However, whenever Bergerud conferred with his attorneys off the record, he told the court "they can't help me" once the proceedings had resumed. Bergerud repeatedly told the court he wanted assistance from new counsel, but that he would represent himself if "that's what [he had] to do" in order to present his desired self-defense theory.

The trial court found that Bergerud's disagreement with his lawyers did not amount to a complete breakdown in communications, but was rather a disagreement about trial strategies that were properly left in the hands of counsel. Moreover, finding that Bergerud's request was not timely and that further delay would inconvenience witnesses, the trial court denied his request for new counsel and found that appointing advisory counsel was not practicable. The trial court thus gave Bergerud the option of either proceeding with his court-appointed attorneys or proceeding pro se. Bergerud stated that he would continue pro se. Knowing that Bergerud's decision was based on his desire to pursue his theory of self-defense, the trial court invited the prosecuting attorneys back into the meeting and directed Bergerud to tell them of his self-defense plan in order to resolve any objection they might raise to the presentation of self-defense prior to finalizing Bergerud's decision. The prosecuting attorneys stated that they did not object to Bergerud presenting a self-defense theory—though the statutory deadline for notifying prosecutors of that plan had come and gone—only if Bergerud decided to proceed without counsel. Bergerud subsequently reaffirmed his choice to proceed pro se.

After the trial, the jury convicted Bergerud on one count of first degree murder, one count of second degree murder, and two counts of first degree assault on a police officer. The trial court sentenced Bergerud to life in prison for first degree murder, forty-eight years in prison for second degree murder, and thirty-two years in prison for

each assault, all sentences to be served consecutively.

On appeal, Bergerud argued that the content of his attorney's opening statements, as well as the trial court's denial of his request for new counsel, violated his constitutional right to representation. The court of appeals reasoned that, by focusing solely and strongly on Bergerud's alleged inability to formulate the requisite mental state for first degree murder, Bergerud's attorneys had effectively conceded his guilt to lesser homicide offenses despite Bergerud's desire to defend against the charges and seek acquittal. The court of appeals concluded that Bergerud enjoyed a fundamental choice regarding election of a defense theory that would seek acquittal, a choice that Bergerud had been denied, and so reversed the trial court's order and remanded the case for a new trial.

The People petitioned this court to review the court of appeals' determination, arguing that Bergerud enjoyed no such fundamental choice when it came to the election of defense theories. We granted certiorari and now reverse the court of appeals.

### III. The Right to Counsel

#### A. De Novo Review

■ The United States and Colorado Constitutions extend an indigent criminal defendant the right to representation. *See* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. Before proceeding pro se, a defendant must knowingly, intelligently, and voluntarily waive his constitutional right to counsel. *People v. Arguello,* 772 P.2d 87, 93 (Colo.1989). "Effective waiver of counsel is a mixed question of fact and law that we review de novo." *People v. Alengi,* 148 P.3d 154, 159 (Colo.2006). Where a trial court determines that substitute counsel is not warranted, "the court can insist that the defendant choose between continued representation by existing counsel and appearing pro se." *Arguello,* 772 P.2d at 94. However, where his attorney's actions were constitutionally deficient and the trial court nonetheless improperly denied the defendant's request for new counsel, such a choice effec-

tively forces a defendant to sacrifice one or more of his trial rights. *See People v. Campbell,* 58 P.3d 1148, 1157–58 (Colo.App. 2002) (impermissible choice between proceeding pro se and proceeding with allegedly ineffective counsel). A defendant's waiver of his right to counsel cannot be considered effective if it is executed under the pretense of an impermissible choice between constitutionally protected rights. *See, e.g., Pazden v. Maurer,* 424 F.3d 303, 313 (3d Cir.2005) ("If a choice presented to a petitioner is constitutionally offensive, then the choice cannot be voluntary." (internal quotations omitted) ). Thus, when a defendant elects to proceed pro se after failing to obtain substitute counsel, we must review the trial court's denial of the defendant's request de novo in order to assess whether the defendant's subsequent waiver of his right to counsel was voluntarily made.

#### B. Limitations on Counsel's Authority

■ Although the defendant remains ever the master of his defense while the attorney's role is that of an assistant, *Faretta v. California,* 422 U.S. 806, 820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the right to an attorney is not a right to a mouthpiece or marionette, but rather to competent counsel who will employ her own professional expertise in effectively representing her client's interests, *see People v. Schultheis,* 638 P.2d 8, 12 (Colo.1981). "[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Faretta,* 422 U.S. at 820, 95 S.Ct. 2525. On issues of trial strategy, defense counsel is "captain of the ship." *Arko v. People,* 183 P.3d 555, 558 (Colo.2008).

■ However, there are three important sources of limitations on a defense attorney's ability to direct the course of a trial. First, certain constitutional rights are given directly to the defendant and cannot be wielded by an attorney representative. *See Faretta,* 422 U.S. at 820, 95 S.Ct. 2525. Decisions such as whether to plead guilty, whether to testify, whether to waive a jury trial, or whether to take an appeal are so fundamental to a de-

fense that they cannot be made by defense counsel, but rather must be made by the defendant himself. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

■■■■■ Second, it is axiomatic that a trial is a truth-seeking endeavor, and so lawyers are restricted from taking actions that would contravene that purpose. *See Schultheis,* 638 P.2d at 12. Principal among these restrictions, counsel's representations cannot be based on falsified evidence or perjured testimony. *See Nix v. Whiteside,* 475 U.S. 157, 166, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); Colo. RPC 3.3. "If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 n.9 (1984). Furthermore, attorneys should not labor under conflicts of interest or a complete breakdown in communications with their clients that prevent them from putting on an adequate defense. *See Arguello,* 772 P.2d at 94.

■■■■■ The "decisions of trial strategy" available to defense attorneys are therefore those bound on the one side by the fundamental choices given directly to the defendant by the Constitution, and on the other by the requirements of honesty and integrity imposed on officers of the court. The third source of limitations on an attorney's actions is that these decisions of trial strategy are held to a standard of professional reasonableness. *See Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Without some ability to review an attorney's allegedly unreasonable decisions, the right to counsel would be a hollow promise. Even so, the principal concern when faced with the allegedly unreasonable decisions of defense counsel is whether those actions undermined the reliability of the result of the proceeding. *See id.* at 691, 696, 104 S.Ct. 2052; *see also Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

## C. Appropriate Test

■■■■ Bergerud contends that his decision to proceed pro se was based on an ineffective waiver of his right to counsel. If a defendant waives his right to counsel and elects to proceed pro se only because he was improperly denied other trial rights, his waiver will not be considered effective. *See Campbell,* 58 P.3d at 1157. Thus, in order to determine whether Bergerud knowingly, intelligently, and voluntarily waived his right to an attorney, we must assess the propriety of the choice with which he was presented by the trial court and his lawyers.[2] That, in turn, depends on the nature of the dispute underlying Bergerud's request for new counsel and whether the trial court properly denied that request.

■■■■ Deciding whether a defendant is entitled to substitute counsel requires an inquiry laden with factual determinations; thus, "when an indigent defendant voices objections to court-appointed counsel, the trial court has the obligation to inquire into the reasons for the dissatisfaction." *Arguello,* 772 P.2d at 94; *see also Garcia,* 64 P.3d at 863. Before a substitution of counsel is warranted, the court must establish that the defendant has "some well founded reason for believing that the appointed attorney cannot or will not completely represent him." *Arguello,* 772 P.2d at 94 (quotations omitted). In performing such an inquiry, a court may inquire as to pertinent details of a disagreement between a defendant and counsel without infringing on the attorney-client privilege. *Id.* Indeed, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's ... litigation decisions." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "Unless the complaint underlying a request for substitution of counsel is sufficiently detailed, the court may not rule on the motion without conducting a proper hearing at which *both attorney and client testify* as to the nature of their conflict." *United States v. Zillges,*

---

**2.** No error is alleged nor could be found regarding the advisement the trial court gave to Berge-

rud pursuant to *Arguello,* 772 P.2d 87.

978 F.2d 369, 372 (7th Cir.1992) (emphasis added, internal quotations omitted).·

As a threshold matter, a court should determine the type of limitation on counsel that is implicated by the defendant's request in order to locate the dispute within the landscape of Sixth Amendment precedent and properly assess any constitutional concerns. Here, Bergerud's complaint against his court-appointed attorneys implicated his rights to enter a plea and to testify in his own defense. Thus, his request for new counsel was, at least in part, a request to exercise rights that were committed to his determination alone and could not be usurped by his attorneys' strategic decisions. *See Barnes,* 463 U.S. at 751, 103 S.Ct. 3308. Were his attorneys to have overstepped their authority and effectively prevented Bergerud from making the fundamental choices extended to him by the Constitution, or had they indicated that his decisions on these matters would not be dutifully followed, Bergerud's choice between proceeding pro se and continuing with counsel would have been "constitutionally offensive" because it would have effectively forced a choice between his right to counsel and other of his trial rights. *See Maurer,* 424 F.3d at 313; *Wilks v. Israel,* 627 F.2d 32, 35 (7th Cir.1980). In such a case, proceeding pro se would have been the only way to protect his decisions to testify and to plead not guilty. Bergerud also alleged that the disagreement with counsel amounted to a complete breakdown in communications that had inhibited the development of an adequate defense.

 In evaluating a defendant's request for new counsel, a court must consider the "need for orderly and expeditious administration of justice" in addition to the "particular facts underlying the defendant's request for new counsel." *People ex rel. M.M.,* 726 P.2d 1108, 1121 (Colo.1986) (citing *People v. Rubanowitz,* 688 P.2d 231, 242–43 (Colo. 1984)). In order to measure the constitutional implications of a defendant's request for new counsel, other courts have directed a three-factor inquiry into (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the defendant's complaint, and (3) whether the attorney-client conflict is so great that it resulted in a total lack of communication or otherwise prevented an adequate defense. *See, e.g., United States v. Simeonov,* 252 F.3d 238, 241 (2d Cir.2001) (citing *United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.1988); *United States v. Allen,* 789 F.2d 90, 92 (1st Cir.1986); *United States v. Whaley,* 788 F.2d 581, 583 (9th Cir.1986)). The Tenth Circuit appends a fourth factor to this test, examining the extent to which the defendant "substantially and unreasonably contributed" to the underlying conflict with his attorney. *United States v. Lott,* 310 F.3d 1231, 1250–51 (10th Cir.2002).

 Taken together, these four factors capture the considerations we have set forth in our precedent and appropriately direct both a trial court's initial inquiry as well as appellate review.[3] The first and fourth factors ensure that a defendant does not use requests for new counsel to unnecessarily delay the judicial process. *See United States v. John Doe No. 1,* 272 F.3d 116, 122 (2d Cir.2001) (noting that "once trial has begun, a defendant has no unbridled right to reject assigned counsel and demand another" and stating that "courts must impose restraints on the right to reassignment of counsel in order to avoid the defendant's manipulation of the right" (internal quotations omitted) ). A court's determination on timeliness should not only consider whether the defendant's request was late in coming, and so would seriously inconvenience witnesses or otherwise disrupt the orderly administration of justice, but should also establish the cause for any delay and whether responsibility for the delay lies with the defendant or with his lawyers.

The second factor recognizes the importance of the facts underlying the defendant's dispute with counsel to an ultimate determination on the matter, and captures this court's concern regarding the adequacy of

---

**3.** These factors were developed to assess a trial court's decision for abuse of discretion. Although we review this case de novo because Bergerud's choice to proceed pro se allowed him to challenge the validity of his waiver of his right to counsel, these factors nonetheless guide our review.

the record when reviewing the constitutional implications of a defendant's request for new counsel. *See, e.g., Ardolino v. People,* 69 P.3d 73, 77 (Colo.2003); *see also People v. Kelling,* 151 P.3d 650, 655 (Colo.App.2006).

■■■ The third factor focuses on the underlying constitutional concern: whether the disagreement or communication breakdown inhibits the presentation of an adequate defense or the defendant's complete representation by counsel. *See Lockhart v. Fretwell,* 506 U.S. 364, 370, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (explaining that Supreme Court precedent has "emphasized that the Sixth Amendment right to counsel exists in order to protect the fundamental right to a fair trial" (internal quotations omitted)). The presentation of an "adequate defense" requires, at least in part, the defense have the "personal character upon which the [Constitution] insists," *Faretta,* 422 U.S. at 820, 95 S.Ct. 2525, and so maintain fidelity to the defendant's decisions on those fundamental choices committed to his determination alone, *see Barnes,* 463 U.S. at 751, 103 S.Ct. 3308.

■■■ Finally, where, having been erroneously denied his request for new counsel, a defendant proceeds with his court-appointed attorneys,[4] the error will generally be examined for prejudice or under principles of harmless error before a new trial is ordered. *See Mickens,* 535 U.S. at 166, 122 S.Ct. 1237 ("As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052)); *Lott,* 310 F.3d at 1250–53 (approving harmless-error analysis for claims of

complete breakdown in communications where defendant remained represented by counsel). However, where, as here, a defendant elects to proceed pro se after voicing a grievance against his attorneys, any violation of his Sixth Amendment rights would result in a *complete* denial of his right to counsel. Such complete violations constitute structural errors in the trial process and warrant a new trial.[5] *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (absence of counsel from beginning to end of trial defies analysis by "harmless-error" standards (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963))).

## IV. Analysis

In order to evaluate Bergerud's waiver of his right to counsel, we must determine whether the choice given him to either proceed pro se or continue with his existing attorneys impermissibly forced him to choose between his right to counsel and other rights associated with his defense. To that end, we must examine the nature of the underlying dispute between Bergerud and his attorneys and its impact on other of Bergerud's trial rights.

■■■ Though represented by counsel at the time, Bergerud, like most defendants in his position, was effectively proceeding pro se during his request for new counsel. *See, e.g., Kelling,* 151 P.3d at 657 (an attorney cannot be expected to present his own ineffectiveness). As such, Bergerud's allegations underlying the request will be broadly construed to ensure he is not denied review of important constitutional issues simply for his inability to articulate his concerns within the

---

4. In such instances, the trial court's decision will generally be reviewed for abuse of discretion. *See People ex rel. M.M.,* 726 P.2d at 1121. In *People ex rel. M.M.,* we stated that the denial of a defendant's motion to discharge his attorney is reviewed for abuse of discretion. *See id.* (citing *Schultheis,* 638 P.2d 8). The court of appeals has generally, and properly, interpreted this to mean that the denial of a defendant's request for new counsel should be reviewed for abuse of discretion. *See People v. Hodges,* 134 P.3d 419, 425 (Colo.App.2005), *aff'd on other grounds,* 158 P.3d 922 (Colo.2007); *People v. Garcia,* 64 P.3d 857, 863 (Colo.App.2002); *People v. Apodaca,*

998 P.2d 25, 28 (Colo.App.1999); *but see People v. Abdu,* 215 P.3d 1265 (Colo.App.2009), *cert. denied* No. 09SC498, 2009 WL 2916988 (Colo. Sept.14, 2009).

5. In addition to being legally inapposite, any attempt to measure the prejudicial nature of the attorney's actions in such circumstances would be ill-conceived where, as here, the attorney left the case having had little substantive contact with the jury and no control over the presentation of evidence or arguments ultimately committed to the jury for consideration.

legal lexicon. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding the allegations of a pro se defendant to "less stringent standards than formal pleadings drafted by lawyers"); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir.2003) (stating the court must liberally construe a pro se complaint and "apply the applicable law, irrespective of whether the pro se litigant has mentioned it by name"); *Marmolejo v. United States,* 196 F.3d 377, 378 (2d Cir.1999) (per curiam) (the papers of pro se litigants are construed liberally).[6]

The record surrounding Bergerud's request for substitute counsel exposes three concerns regarding the effectiveness of his waiver of counsel. First, and as emphasized by the court of appeals, there is a concern that, by focusing on his mental state, Bergerud's attorneys effectively pled him guilty to lesser homicide crimes against his wishes. Second, Bergerud's attorneys may have wholly undermined his ability to testify in his own defense by stating Bergerud did not know himself what happened on the night of the killings. In either event, Bergerud's attorneys would have overstepped their bounds and appropriated fundamental choices committed to the defendant's decision alone. Third, Bergerud argued that the conflict with his attorneys concerning whether to pursue a theory of self-defense resulted in a complete breakdown in communications and implied that his attorneys had failed to investigate his desired self-defense theory.

We review each of these concerns about the effectiveness of Bergerud's waiver of counsel in turn, guided by our consideration for the orderly administration of justice, the adequacy of the record, and the extent and cause of the breakdown in communications, as set forth above in our four-factor test. The timeliness of the motion—unlike the other factors of our four-factor test—applies identically to each concern, and so we discuss that factor first. We determine that, although Bergerud's request for new counsel was not timely, it is unclear on the record whether the delay is attributable to Bergerud or to his attorneys. Proceeding to address each of the concerns under the remaining three factors of the test, we conclude Bergerud's right to enter a plea was not violated by his attorney's opening statements. As to the other two concerns, though, the record is insufficient for us to determine if Bergerud's attorneys impermissibly constrained his trial rights, and thereby undermined the voluntary character of his waiver of his right to counsel. As such, we remand this case for further consistent proceedings.

## A. Timeliness of the Request

The trial court found that the defendant's motion for new counsel was not timely. Although we agree, the reason for the delay is not in the record.

It is exceedingly difficult for a trial court to adequately address conflicts between a defendant and counsel when the jury is waiting in the next room for the trial to proceed. "When a defendant makes an untimely request for new counsel on the eve of trial or under circumstances which are likely to result in a continuance, the judge must carefully inquire into the defendant's reasons for the request to determine whether they are sufficiently substantial to justify postponing the trial." *Arguello,* 772 P.2d at 94. The months invested in preparing for the trial, and the burdens already placed on the lives of witnesses, should not be lightly tossed aside once the trial has begun. As such, both the defendant and his attorneys have an obligation to bring conflicts to the attention of the court at the earliest practicable time, lest requests for new counsel or time to resolve such conflicts be used to obstruct the orderly administration of justice. *See, e.g., John Doe No. 1,* 272 F.3d at 122. Of course, a defendant's conduct is often bridled by an impression that he must engage a court through his lawyers. As such, a defendant will be held to have discharged his

---

6. Our precedent requiring that pro se defendants be held to applicable rules of procedure and evidence is neither implicated here, nor influenced by this discussion. *See, e.g., Manka v.* *Martin,* 200 Colo. 260, 267, 614 P.2d 875, 880 (1980); *Viles v. Scofield,* 128 Colo. 185, 187, 261 P.2d 148, 149 (1953).

duty where he makes a reasonable effort to bring the matter to the court's attention.

During the six months leading up to the trial, the trial court held several hearings on pre-trial motions, with Bergerud present, at which Bergerud's court-appointed attorneys examined potential trial witnesses. In doing so, his attorneys clearly indicated that their central concern at trial would be evidence relating to Bergerud's intoxication and mental state at the time of the killings. Furthermore, during the four days of voir dire immediately prior to trial, the questions posed by Bergerud's attorneys to prospective jury members focused almost exclusively on their ability to consider such evidence. Bergerud should have known the disagreement with his counsel had not been resolved prior to opening statements.

However, Bergerud alleges that he repeatedly asked his attorneys to change their approach, that he stated he needed new attorneys if they were not willing to pursue the self-defense theory, and that he was "surprised" by the opening statements. According to Bergerud's unrefuted account, he thought the disagreement with his attorneys had been resolved and that they had agreed to go forward with a theory of self-defense. On this account, it appears less that Bergerud was late in raising his concerns and more that his lawyers were late in bringing them to the attention of the trial court. If Bergerud was as relentless as he insists in demanding that his lawyers present his self-defense theory, his lawyers should have alerted the court to the disagreement before the trial began, especially in light of how the election of a defense theory here presupposes decisions as to certain of Bergerud's fundamental choices. "If a disagreement on significant matters of tactics or strategy arises between defense counsel and the client, defense counsel should make a record of the circumstances, counsel's advice and reasons, and the conclusion reached." ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 4–5.2(c) (3d ed.1993).[7] Of further concern, when his attorneys did inform the trial court that Bergerud wished to speak with the court regarding his representation, their comments indicate Bergerud may have asked to do so before.

On the other hand, his attorneys' failure to raise the issue before the court, and their comment that they were not "prepared" to call the disagreement a breakdown in communications, indicate that perhaps Bergerud was less persistent than he alleges, or that his attorneys had thought the matter resolved *against* presentation of the self-defense theory. Additionally, some of Bergerud's statements in those proceedings cast doubt on his ability to understand what the self-defense theory entailed.[8] It may well be that Bergerud should bear some or even most of the blame for the lateness of the motion for new counsel, but as it stands, counsel's reticence to discuss the disagreement with the court inhibits such a conclusion. Without more, these inferences cannot overcome Bergerud's account of the dispute; the lateness of Bergerud's request for new counsel cannot, on the existing record, be held against him.

Any request for new counsel that is made once the trial has begun puts a trial court in a difficult position. Here, if Bergerud was surprised by his lawyer's opening statements, despite these concerns for the orderly

---

7. Although the record of such a dispute should generally be made "in a manner which protects the confidentiality of the lawyer-client relationship," ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 4–5.2(c), a defendant may be found to have impliedly waived the lawyer-client privilege—though only to the extent necessary to facilitate the trial court's required inquiry—insofar as his dispute with counsel constitutes "a claim or defense that focuses on advice given by the attorney." *People v. Trujillo*, 144 P.3d 539, 543 (Colo.2006) (citing *Morse v. People*, 180 Colo. 49, 501 P.2d 1328 (1972)).

8. For example, the defendant noted that his attorney during his first trial had employed a "toxicology and mental impairment" defense, and then commented that "when the [first] trial was over, [my attorney then] came and talked to me and he says 'we just went down the wrong avenue. We probably needed to go with self-defense.' ... Which I didn't understand that the two were separate. I thought basically that's what we were actually doing."

administration of justice, the timing of his request for new counsel cannot override the other factors of our review.[9]

### B. Right to Enter a Plea

■ Bergerud contends that, when presented with the choice between presenting the self-defense theory or proceeding with counsel, he was impermissibly forced to choose between two fundamental constitutional rights: the right to counsel and the right to enter a plea of not guilty and so require prosecutors to prove their case beyond a reasonable doubt. *See Cronic,* 466 U.S. at 657 n. 19, 104 S.Ct. 2039 ("[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt."). This argument relies on the proposition that his lawyer's opening statements were tantamount to a guilty plea or a judicial admission, relieving the prosecution of its burden of proof—at least with respect to some of the lesser homicide offenses. Only if the opening statement effectively foreclosed later arguments for outright acquittal would the two options pose the intractable dilemma that Bergerud claims. *See Arko v. People,* 183 P.3d 555, 558 (Colo.2008) (distinguishing between requests that a jury consider lesser included offenses and guilty pleas by noting that, in the case of the former, a defendant "retains the opportunity to advocate for outright acquittal").

■ The court of appeals concluded that the contentious opening statements were the equivalent of a guilty plea, and so the options posed to Bergerud by the trial court impermissibly required him to choose between two constitutional rights to which he should have been entitled. We disagree. Because this issue stems from the content of the opening statements alone, nothing beyond the transcript of those statements is needed to support our final determination on the matter. After examining the opening statements carefully and considering them in context, we conclude they did not act as a concession of Bergerud's guilt.[10]

■ The right to enter a plea is one of those fundamental choices that must be decided by the defendant alone. *See Barnes,* 463 U.S. at 751, 103 S.Ct. 3308. Counsel cannot concede the defendant's guilt to a crime over his express objection, thereby waiving his privilege against compulsory self-incrimination.[11] *See Boykin v. Alabama,* 395

9. Because the trial court granted Bergerud's subsequent request to proceed pro se, we need not here decide whether the court could have denied that request and required him to continue with his attorneys. *See, e.g., Williams v. Bartlett,* 44 F.3d 95, 99, 100 n. 1 (2d Cir.1994) (discussing a defendant's constitutional right to represent himself, stating that "[a] criminal defendant must make a *timely* and unequivocal request to proceed pro se in order to ensure the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial," and describing the factors a trial court should consider in exercising its discretion to grant an untimely request (emphasis added) ); *see also Buhl v. Cooksey,* 233 F.3d 783, 795 (3d Cir.2000) (citing numerous federal courts of appeals cases for the proposition that a defendant's request to proceed pro se must be made before the jury has been impaneled or meaningful trial proceedings have begun); *People v. King,* 121 P.3d 234, 237 (Colo.App.2005) (defendant must timely assert his constitutional right to self-representation). Of course, had Bergerud been required to proceed with existing counsel rather than given the choice to proceed pro se, *cf. Arguello,* 772 P.2d at 94 (allowing such a choice), the alleged constitutional deficiencies of his attorneys' representation would have been properly reviewed under a claim of their ineffective assistance.

10. In its opinion, the court of appeals reasoned that defendants enjoy a fundamental right to choose whether or not to pursue an "innocence-based" defense. Precisely what constitutes an "innocence-based" defense—and whether self-defense should be considered such a defense theory—is somewhat confused by the parties' briefs. The category would appear to evade consistent application across all contexts, because, in many cases, which defense theories aim for the defendant's complete acquittal depends as much on the charged crime and whether instructions on lesser included offenses are sought as it does on the defense theory itself. In any event, we conclude that the fundamental choices committed to the defendant's decision—including the rights to enter a plea and to testify—provide for adequate protection of a defendant's constitutional rights at trial. We therefore decline to append a new choice to the list of those already entrusted to the defendant alone.

11. The People's reliance on *Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), to assert the contrary is misplaced. There, the

U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *see also Brookhart v. Janis,* 384 U.S. 1, 4–7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (holding defense counsel's agreement to a truncated trial was the "equivalent of a guilty plea" and so required the defendant's consent).

However, in order to distinguish them from flourishes of argument meant to highlight certain points for the jury, such a concession must rise to the level of judicial admissions before they will be deemed violative of the defendant's rights. "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *People v. Bertagnolli,* 861 P.2d 717, 720 (Colo.1993) (quoting *Kempter v. Hurd,* 713 P.2d 1274, 1279 (Colo.1986)). Further, a judicial admission acts as evidence against the party making it and may "constitute the basis of a verdict." *Gordon v. Benson,* 925 P.2d 775, 781 (Colo.1996) (quoting *Larson v. A.T.S.I.,* 859 P.2d 273, 275 (Colo.App.1993)).[12] In assessing whether a disputed statement constitutes a judicial admission, the statements should be read as a whole and understood in light of their context. *Gordon,* 925 P.2d at 781; *see also D.R. Horton, Inc.-Denver v. Bischof & Coffman Const., LLC,* 217 P.3d 1262, 1276–79 (Colo.App.2009).

Here, although focusing exclusively on a "toxicology and mental impairment" defense, the opening statements given by one of Ber-

gerud's lawyers stopped short of a concession of guilt on any element of the charged crimes. Bergerud's lawyer began her opening by stating, "What happened on April 7, 2002 was horrible. It was violent, and it was tragic. But it was not first degree murder after deliberation." Following this introduction, Bergerud's lawyer stated she would "be concentrating on the mental state elements that the prosecution is required to prove in this case." She asked a rhetorical question to frame the rest of her opening statement: "[W]hat evidence will you hear that will help you decide the mental state of Allen Bergerud on April 7th?" She then answered her question, outlining at length the various evidence defense counsel would present that would weigh against a finding of deliberation: his "brain dysfunction," brittle diabetes, mental health issues, depression, low IQ scores, and high level of intoxication. No other kind of evidence or defense theory was mentioned. Bergerud's lawyer concluded by stating, "[A]t the end of this case [defense counsel] will ask you to find him not guilty of charges that require intent and after deliberation."

Given their placement in the opening statements—which are neither evidence themselves, nor do they constrain later argument or introduction of evidence—we conclude, contrary to the court of appeals, that the comments made by defense counsel did not here rise to the level of judicial admissions of Bergerud's guilt; the opening statement was not the equivalent of a guilty plea. Nothing in these statements excused prosecutors

Supreme Court considered whether defense counsel's concession of guilt without the defendant's express consent constituted ineffective assistance of counsel. The Court's holding was very narrow:

> [I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent.

*Id.* at 192[, 125 S.Ct. 551]. As illustrated by the holding, both the fact that capital cases present defense attorneys with different strategic decisions than do other cases and the defendant's silence were critical to the Court's conclusion.

*See id.* at 191–92[, 125 S.Ct. 551]. Neither consideration applies here where the death penalty has been abandoned by the prosecution and the defendant *explicitly* objected to counsel's actions on his behalf.

**12.** Bergerud uses "judicial admission" and "guilty plea" interchangeably when arguing that his lawyer's opening statement acted as an inappropriate concession of guilt. For the purposes of this discussion only, we agree that it is a distinction without a difference. *Compare Boykin,* 395 U.S. at 242–43, 242 n. 4, 89 S.Ct. 1709 (describing a guilty plea as "more than a confession which admits that the accused did various acts;" it is a "stipulation that no proof by the prosecution need be advanced" (internal quotation marks omitted)) *with Bertagnolli,* 861 P.2d at 720 (describing judicial admissions) *and Benson,* 925 P.2d at 781 (same).

from meeting their burden of proof with respect to the elements of the crime charged, nor closed the door on defense counsel later asking for Bergerud's outright acquittal. *See Arko,* 183 P.3d at 558. A choice to proceed with counsel would not have been a choice to plead guilty to any element of the charged crimes.

## C. Right to Testify

In his comments to the trial court, Bergerud complained that "[t]he opening statement that was given yesterday is damaging towards a self-defense case." Throughout its inquiries into his dispute with counsel, the trial court responded to Bergerud's concerns that the opening statements were "damaging" by assuring Bergerud that he could testify as to his own recollection of the events. Bergerud's consistent response to this invitation was that his lawyers would not help him. He repeatedly stated that, if the trial court denied his request for new counsel, he had "no other choice" than to appear pro se in order to present his theory of self-defense. His comments strongly suggest that Bergerud believed he could not testify as he desired, notwithstanding the trial court's advisements to the contrary. The thrust of his comments indicates he believed his attorneys would completely contradict his testimony, were he to offer it.

■■■ This court has long held that "the decision whether a defendant should exercise his right to testify [is] one of such compelling importance that it is excluded from the group of constitutionally based rights that defense counsel can elect to exercise or waive on the behalf of the accused." *People v. Curtis,* 681 P.2d 504, 512 (Colo.1984). As we noted in *Curtis,* "whether or not it improves the defendant's chances of acquittal, his desire to tell his side in a public forum may be of overriding importance to him.... The wisdom or unwisdom of the defendant's choice does not diminish his right to make it." *Id.* at 513 (internal quotations omitted); *see also Rock v. Arkansas,* 483 U.S. 44, 52–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (describing the origins and importance of a defendant's right to testify). As with his right to enter a plea, if Bergerud's attorneys impermissibly

waived his right to testify, then Bergerud would have been presented with an impermissible choice to either testify or proceed with counsel.

As a threshold matter, it must be noted that the option the trial court presented to Bergerud was not the ultimatum it has been characterized to be by the parties and the court of appeals. Rather, the court took pains to ensure the defendant knew he could present his testimony and get a jury instruction on self-defense even with his attorneys' continued representation. Early in the proceedings, the court advised Bergerud:

> [Y]ou have the right to testify; no one, including your attorneys, can prevent [you from] testifying, so if you have a theory of the case that you wish to advance, you can testify about that at the-at an appropriate time when it's your time to present evidence.

The trial court repeated this sentiment three more times before accepting Bergerud's decision to proceed pro se as final.

Although certainly true as a matter of law, the trial court's proposal likely seemed a hollow offer because, in her opening statement, one of Bergerud's lawyers had undercut the value of any testimony Bergerud may have provided. She stated:

> Allen Bergerud was not thinking clearly that night. In fact, he was so out of it, so hasty, so impulsive, that at times it becomes hard to even understand what happened out there. Allen Bergerud himself today cannot believe what happened out there. And *it may be that Mr. Bergerud doesn't know how things happened out there, or that he's convinced himself otherwise.*

(Emphasis added). She went on to note that, when the officers pulled Bergerud from his truck after their fire fight, Bergerud said "the man in the truck shot me. And clearly to everyone who was there, that is not what had just happened." Bergerud's lawyer also emphasized that his medical conditions inhibited his perceptions, and in her conclusion she stated that Bergerud "broke," that he "lost it," that he "reach[ed] his breaking point," and then did "something catastroph-

ic." The one time in the course of her opening statements that Bergerud's lawyer mentioned anything related to his claim of self-defense, she painted it as beyond belief, stating:

> [T]he paramedics will tell you ... they felt [Bergerud] might be in pain because of the injuries to his hand and they gave him morphine. And instead of that sedating him or calming him down, he becomes talkative, talks about [the victims], they were out to get him, they came to get him. [The male victim] had gone to mess with him at the lake, and he's making these statements that just don't seem to correlate with what the officers viewed in the field that night.

These comments are not only in tension with the substance of Bergerud's desired testimony, they attack the very believability of that testimony before it is given and cast his account of the night's events as absurd and a figment of his imagination. The right to testify would be empty indeed were it permissible for the defendant's lawyer to instruct the jury to ignore everything the defendant says. To allow such would be to strip the defense of the "personal character upon which the [Constitution] insists." *Faretta*, 422 U.S. at 820, 95 S.Ct. 2525.

Notwithstanding these concerns, we do not consider indirect comments made during opening statements, by themselves, to be of such importance that they can immediately trigger a violation of the defendant's right to testify. However, the strength of these comments—and the fact that Bergerud contends he made his attorneys aware of his desire to pursue a claim of self-defense months before the trial began—cannot be brushed aside. Taken as an indication of their intent throughout trial, it appears from the opening statement that Bergerud's lawyers would have completely contradicted his self-defense testimony, and indeed may have wholly undermined his right to testify by arguing not only that his testimony was inaccurate, but that anything Bergerud may have said cannot be believed due to his mental state at the time of the killings. Defense attorneys must often begin a trial without knowing whether their client will exercise his right to testify. In such situations, it is the defense attorney's constitutional duty to present arguments in such a way that will leave that door open to the defendant. That is not to say that the defendant can mandate, through his desire to testify, that his attorneys adopt specific trial strategies. Nor do we mean that counsel's actions cannot be in tension with the substance of the defendant's desired testimony: it is permissible for an attorney to adopt trial strategies that effectively argue in the alternative to the thrust of the defendant's testimony. Rather, defense counsel cannot, through their trial actions, reduce their client's constitutional right to a nullity.

Here, it is clear, at least from Bergerud's unrefuted account, that his attorneys should have known he wished to testify. Further coloring this concern are Bergerud's comments to the trial court that, to the best of his understanding, his lawyers would not argue the self-defense theory. Moreover, at various times throughout the proceedings, the trial court provided Bergerud with an opportunity to continue discussions with his attorneys off the record. Each time, upon reconvening, Bergerud forcefully stated that he wanted to "go with" self-defense, and that his attorneys had stated they "could not help" him. Finally, even the trial court admitted that it did not know "what [Bergerud's] lawyers would do with [self-defense] evidence" if it were presented.

Bergerud's attorneys, though given ample opportunity, never commented on any substantive aspect of their disagreement with their client. Apparently uncomfortable arguing for either result on the question of whether their client should receive new counsel, they declined to speak on the matter, or even to brief the issue to the trial court to help inform the court's decision. Their reticence was unwarranted and ultimately inhibits our review.

We are sensitive to the fact that the trial court's inquiry concerned a then ongoing attorney-client relationship (as opposed to an inquiry concerning an ineffective assistance claim brought on a post-conviction motion), and that it is difficult for counsel,

mindful of their obligations of client confidentiality, to reveal details of their relationship with the defendant. However, those obligations must yield to the court's need to investigate the nature of the attorney-client dispute. When a defendant requests substitute counsel, the defendant's claims bring the very nature of the attorney-client relationship to the center of the court's attention. A trial court must be able to assess whether a defendant's trial rights have been adequately protected when faced with a motion for new counsel. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. To that end, a request for new counsel necessarily implies a limited waiver of the attorney-client privilege; the trial court must be able to inquire into the details of a dispute between a defendant and his attorneys—outside the presence of opposing counsel—in order to evaluate the dispute's constitutional character and determine whether the defendant is entitled to replacement counsel. *See Arguello*, 772 P.2d at 94; *see also People v. Trujillo*, 144 P.3d 539, 543 (Colo.2006) (discussing implied waiver of attorney-client privilege); C.R.C.P. 1.6(b)(7) (allowing attorneys to reveal confidences to a court in order to "comply with other law or a court order"). Concomitant with this, defense attorneys have a duty to respond to a court's specific inquiries regarding the dispute, to speak to their client's allegations, and to explain their reasoning surrounding pertinent trial decisions.

■ Here, his attorneys' silence obstructs an evaluation of whether Bergerud meaningfully retained his constitutional right to testify while represented by counsel. Although Bergerud's lawyers were free to advise him against testifying, they could not, absent some ethical concern, threaten to withdraw as his attorneys or to completely contradict or wholly undermine his testimony were he to exercise that constitutional right.[13] The trial court's advisements that Bergerud could testify to the events as he

remembered them would have meant little if Bergerud's attorneys were contradicting them during recesses. No matter how reasonable or astute counsel's trial strategies, they cannot take control of those decisions reserved for the defendant alone. *See Curtis*, 681 P.2d at 512. Without some assurance from counsel that they would not completely contradict the defendant's testimony if offered, we cannot conclude as the trial court did that the conflict merely concerned issues of trial strategy. *Arguello*, 772 P.2d at 93 ("Any doubts regarding the waiver must be resolved in the defendant's favor." (citing *United States v. Williamson*, 806 F.2d 216, 220 (10th Cir.1986)) ); *see also People v. Tackett*, 742 P.2d 957, 961 (Colo.App.1987) (stating that counsel may not prevent a defendant from presenting an alibi during his own testimony absent an effective waiver of his right to testify, but noting that where the "defendant's alibi is to be established by testimony of witnesses other than defendant, the decision whether to present such defense is a strategic and tactical decision within the exclusive province of defense counsel." (citations omitted) ). We cannot, on the record before us, determine whether Bergerud truly "retain[ed] all of his trial rights." *Arko*, 183 P.3d at 558. Indeed, the record "strongly suggests" that Bergerud's attorneys would have wholly undermined his testimony if offered. *Wood v. Georgia*, 450 U.S. 261, 273, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). To this end, it remains unclear, despite the trial court's valiant efforts, whether Bergerud's waiver of his right to counsel was knowing and voluntary.

### D. Complete Breakdown in Communications

■ Finally, Bergerud's complaint to the trial court about his attorney's conduct amounts to an allegation that communication with his court-appointed counsel had com-

---

13. Of course, Bergerud had no right to offer perjured testimony, nor to have it accommodated by the representations of his lawyers. *See, e.g.*, § 18–8–502, C.R.S. (2009) (perjury in the first degree). However, what little record there is on this issue seems to suggest that his attorneys perceived no ethical problem underlying their disagreement with their client. Bergerud's law-

yers clarified to the trial court that they did not intend to withdraw from the case, and further noted that they were "not prepared" to describe the relationship as "broken down to the point where [they could not] be effective as counsel for Mr. Bergerud." Although not dispositive of the matter, it is the only mention in the record of the attorneys' perception of the disagreement.

pletely broken down.[14] "A defendant who cannot communicate with his attorney cannot assist his attorney with preparation of his case." *Lott,* 310 F.3d at 1250. Therefore, "[a] trial court's failure to appoint new counsel when faced with a total breakdown in communications may ... constitute a denial of counsel." *Id.*

Upon hearing of Bergerud's dissatisfaction with his court-appointed attorneys, the trial court engaged in the requisite inquiry into the nature of Bergerud's complaint. *See Garcia,* 64 P.3d at 863. The court specifically asked Bergerud to explain the alleged conflict, to outline his proposed self-defense theory, and to pinpoint just what evidence he would present in pursuit of this defense that his attorneys did not agree with.

Bergerud's conflict with his attorneys was apparently twofold. His central concern appeared to be the impact the opening statement would have on the jury. He told the court:

> I feel that opening statement has to be changed in a self-defense case.... I think on a self-defense case, you have to make the jurors aware of certain things that they're going to hear in testimony from the witnesses that are going to proceed in the trial.

At this point, the trial court explained to Bergerud that opening statements were not evidence, but rather statements "of what is expected to be presented, and if somebody else is presented[,] that doesn't mean that the jury doesn't get to consider that other evidence." Nonetheless, Bergerud insisted that there had to be a new opening statement so that later witness testimony would "ring a bell" with the jury, reminding them of the presentation of the case in opening statements.

His only other detail of disagreement concerned a witness that had not been subpoe-

naed by his attorneys. Bergerud stated that this witness would testify that "he had been robbed by [the male victim] and that he had sold a large quantity of methamphetamines to [the male victim]."

Following this discussion, the trial court concluded that the disagreement between Bergerud and his attorneys was not the complete breakdown in communications that Bergerud alleged, but rather a divergence on matters of trial strategy. Evidently, in the trial court's measured view, the decision not to subpoena the additional witness and the framing of the case in opening statements were both reasonable decisions that did not constitute grounds for substitution of counsel or indicate that the attorneys would not present an adequate defense.

 On these points, the trial court's conclusions are unassailable. What "bells" the evidence will ring with the jury vis-à-vis the opening statements is clearly a decision left in the hands of defense counsel. Determining whether to subpoena certain potential witnesses is also a power allocated to defense attorneys. *See Schultheis,* 638 P.2d at 12; *see also Greiner v. Wells,* 417 F.3d 305, 323 (2d Cir.2005) ("The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess." (internal quotations omitted)); *United States v. Feyrer,* 333 F.3d 110, 119 (2d Cir.2003) (discussing an attorney's decision not to subpoena a "peripheral" witness as a matter of trial strategy); *United States v. Moore,* 104 F.3d 377, 391 (D.C.Cir. 1997) (no ineffective assistance in failing to subpoena a witness whose testimony was "tangential at best").

However, there is a troubling indication in the record that Bergerud's attorneys failed to adequately investigate his desired theory of self-defense.[15] Bergerud's attorneys nei-

---

**14.** When describing the situation to the trial court, Bergerud repeatedly stated that he had a "conflict of interest" with his attorneys. However, although the gravamen of his complaint is that he was unable to effectively communicate with his attorneys or convince them to pursue his desired strategies—and not that his attorneys labored under a conflict of interest because of their

obligations to other clients—we here discuss the disagreement by its proper name.

**15.** To our knowledge, allegations that an attorney failed in her duty to investigate pertinent matters to the defense have only before been considered as a claim to the attorney's ineffective assistance, raised once the defendant has been convicted after being represented at trial. We

ther refute nor recast his account of their discussions, in which Bergerud alleged they baldly refused to develop the theory of self-defense and ignored his account of the night's events. Because of defense counsel's reticence to discuss the underlying dispute, there is some concern that Bergerud's attorneys failed in their duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; *see also People v. Herrera*, 188 Colo. 403, 405–06, 534 P.2d 1199, 1200–01 (1975) (describing a lawyer's duty to investigate possible defenses or make reasonable determinations not to pursue them).

It may well be that Bergerud's attorneys *did* investigate the self-defense theory he urged them to and decided reasonably, based on the evidence at hand, that the theory was not viable for presentation. It may also be that Bergerud's counsel, acting on his information, reasonably determined that they should not investigate or pursue the theory further.[16] *Cf. Herrera*, 188 Colo. at 405–06, 534 P.2d at 1200–01; *see also Ardolino*, 69 P.3d at 76 ("Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). However, the record merely contains evidence that Bergerud's first attorney thought self-defense a viable theory and that Bergerud's own recollection supported the theory. The record's silence concerning counsel's investigations and determinations prohibits us from concluding whether the alleged breakdown in communications did indeed prevent Berge-

rud's attorneys from putting on an adequate defense. Without further factual development, we cannot conclude whether the alleged breakdown in communications was attributable to Bergerud himself, nor place our imprimatur on the trial court's conclusion that Bergerud's conflict with counsel was likely to recur were he appointed new attorneys.

## V. Remand

 As we have noted in the context of ineffective assistance claims, a well-developed record regarding attorney decisions and the nature of the disagreement between counsel and her client is critical to the evaluation of alleged Sixth Amendment violations. *See, e.g., Ardolino*, 69 P.3d at 77; *People v. Thomas*, 867 P.2d 880, 886 (Colo.1994). A proper inquiry by a trial court will not only clarify the nature of the dispute and develop a record to facilitate appellate review, but will provide a framework within which the dispute may be resolved.

At the outset, the inquiries into the nature of the dispute should take place without the presence of the prosecution, as the trial court properly did here. Of course, the prosecuting attorneys may need to be informed about a proposed resolution of the dispute to the extent that it impacts their preparedness or the ability to proceed to trial. However, sharing anything more than necessary to resolve these matters with the prosecuting attorneys could seriously prejudice the accused's defense. These concerns were artfully managed by the trial court in this case.

 Next, where the defendant's concerns implicate his constitutional rights or his authority over related fundamental

note that such allegations may not be ripe for review in every case when brought to the court's attention prior to the trial's conclusion. However, where, as here, the allegation comes once trial has begun, and indeed after defense counsel allowed the statutory notice deadline for intended self-defense presentations to pass, C.R.C.P. 16(II)(C), Bergerud's complaint that his attorneys failed to adequately investigate the theory is properly reviewable. Assuming their actions failed their duty, that failure was at hand, not merely anticipated.

**16.** We will not, as the People appear to request, examine the evidence made available in Bergerud's later pro se trial to determine whether counsel's apparent determination not to investigate the self-defense theory would have been invariably reasonable. To do so would be to use Bergerud's own inartful efforts at trial to illustrate that any lawyer would be reasonable to refuse to put on such a defense, even though Bergerud had continually asserted that he needed assistance to effectively argue his case to a jury.

choices, a trial court must inquire into the details of the dispute in order to evaluate the attorneys' decisions. It must then assess whether any improper actions have already resulted in a constitutional violation, or whether the attorneys' assurances that their client's rights will be protected going forward is enough to ensure the reliability of the proceedings and the justice of their result. Where, on the other hand, the trial court determines that the defendant's concerns do not relate to his ability to make those fundamental decisions nor otherwise indicate his attorneys will be unable to present an adequate defense, the defendant will have failed to establish the requisite good cause for granting a motion for new counsel. *See Arguello,* 772 P.2d at 94.

■ Finally, if the trial court's inquiry was inadequate or the record cannot support final assessment of the alleged violation, the proper remedy, rather than automatic reversal, is to remand the matter for further factual development. *See, e.g., Wood,* 450 U.S. at 273, 101 S.Ct. 1097 (remanding for the trial court "to determine whether the conflict of interest that [the] record strongly suggests actually existed"); *Lott,* 310 F.3d at 1249–50 (inadequate record concerning motion for new counsel remedied by remand to trial court for investigation as to the underlying facts of the disagreement); *Kelling,* 151 P.3d at 655 (same).

Here, guided by the four factors of our review, we conclude under the second factor that the trial record is insufficient to support the trial court's denial of Bergerud's request for new counsel or our assessment of the motion under the remaining three factors; namely, why Bergerud's motion for new counsel was so late in coming, whether his counsel's conduct did indeed prevent the development of an adequate defense, and to what extent Bergerud may have significantly contributed the conflict with his lawyers. Although the record is sufficient for us to conclude that Bergerud's right to enter a plea had not been impermissibly appropriated by his court-appointed counsel, we cannot tell whether Bergerud meaningfully retained his right to testify while represented by counsel or whether his attorneys had failed in their duty to reasonably investigate possible defenses. Thus, we reverse the court of appeals opinion and order that the case be remanded with directions for inquiries to address the inadequacies of the record.

■ To address the questions left unanswered by the record, the trial court should first determine what caused the delay of Bergerud's request for new counsel, as per the first factor of the four-factor test. If Bergerud should have known the dispute remained unresolved and failed to bring the conflict to the attention of the court earlier despite opportunity to do so, then he was not entitled to substitute counsel and no further inquiry will be required. However, in the event the trial court concludes that Bergerud's lawyers stifled his attempts to bring the matter to the court's attention, or that Bergerud reasonably believed—based on communications with his lawyers—that the conflict had been resolved, then the court must further consider the extent to which his lawyers' actions abrogated Bergerud's other trial rights.

■ In order to evaluate under the third factor of the test whether a constitutional violation prohibited the development of an adequate defense sensitive to Bergerud's fundamental choices, the trial court must determine whether Bergerud's attorneys contradicted or contravened the court's advisements concerning Bergerud's right to testify. If, as the record suggests, Bergerud's counsel indicated in their discussions with him that they would completely contradict his testimony were he to offer it, or that they would otherwise persist in wholly undermining the believability of his testimony through their presentation of evidence, then his lawyers impermissibly usurped his fundamental choice to testify.

The trial court should also inquire as to the clarity and persistence with which Bergerud voiced his disagreement to his counsel in order to determine whether Bergerud substantially and unreasonably contributed to the disagreement with his attorneys, pursuant to the fourth factor of the analysis. If he waffled in his desire to testify, intermittently conceded that self-defense was not the best

strategy, or gave his attorneys the impression that he supported the course of action they later took in the opening statement, Bergerud's attorneys' strategic decisions not to further investigate the self-defense theory and to pursue the "toxicology and mental impairment" defense appear patently reasonable. Furthermore, any inadvertent constraint on his right to testify would have been the natural result of their client's own representations. If, however, Bergerud was as unwavering in his demands as he contends, or if his attorneys understood the nature and degree of their disagreement with their client but nonetheless refused to investigate the self-defense theory or insisted on effectively nullifying Bergerud's wish to testify, then their actions impermissibly constrained Bergerud's trial rights and Bergerud was entitled to replacement counsel.

Of course, these inquiries must be sensitive to the fact that there are limitations imposed upon counsel's actions in order to ensure the honesty and integrity of the trial mechanism. Where it appears ethical concerns may have limited the attorneys' choices, that information will be folded into the assessment of the alleged Sixth Amendment violations, supporting the trial court's finding that the conflict is likely to recur with other counsel and excusing strong advisements given to Bergerud regarding his right to testify that did not squarely contradict those given by the trial court.

Finally, unlike some Sixth Amendment violations, the complete denial of counsel will not be examined for prejudice or harmlessness. The complete absence of counsel is a structural error demanding reversal for a new trial. *See Fulminante,* 499 U.S. at 309–10, 111 S.Ct. 1246. Without more, the record will not support the trial court's conclusions that Bergerud's dispute with counsel concerned only matters of trial strategy or that it was likely to recur were Bergerud to have been awarded new counsel. Thus, if the trial court does not find either that Bergerud failed to make reasonable efforts to bring the conflict with his attorneys to the attention of the court at the earliest practicable time, or that Bergerud both meaningfully retained his right to testify and that his attorneys made

reasonable investigations (or reasonable determinations not to investigate) regarding Bergerud's self-defense theory, then the court must order a new trial.

## VI. Conclusion

For the foregoing reasons, the opinion of the court of appeals is reversed with directions to remand the case for further proceedings consistent with this opinion.

Justice COATS dissents, and Justice RICE and Justice EID join in the dissent.

Justice COATS, dissenting.

While I readily acknowledge the difficulty of ensuring criminal defendants, at one and the same time, both a meaningful right to the effective assistance of counsel and a right to personally exercise certain fundamental prerogatives free of counsel's approval or consent, I believe the majority misapprehends the nature and limits of these particular rights and therefore the relationship between them. Perhaps even more importantly, I fear that the complexity and sweeping scope of the majority's opinion is likely to force upon defense counsel and trial courts alike intolerable choices, necessarily based on imprecise predictions about the unfolding of events at trial. I therefore briefly outline my concerns, in the hope that until it is reversed, overruled, or at least limited, the majority opinion will be applied with caution and extended beyond the circumstances of this case no more than absolutely required by its own terms.

Ostensibly, the majority rejects outright the notion of a fundamental right to an innocence-based defense, as found by the court of appeals, maj. op. at 699 n. 10, but in the very act of doing so it carves out an even broader right of criminal defendants to control the conduct of their counsel and defense. By construing the fundamental (and personal) right to testify on a defendant's own behalf to include not only taking the stand and giving his account of relevant matters but also the assurance that his testimony will not be undermined by his own counsel, the majority effectively creates a new measure of counsel's effectiveness—one that is not limited by

considerations of materiality or prejudice. After today, a criminal defendant apparently need only make known to his appointed counsel the content of his intended testimony and make a timely request for substitution upon learning that counsel intends (or has already done something) to undermine his plan, in order to entitle himself to the appointment of substitute counsel and a mistrial if jeopardy has already attached, or to automatic reversal if he is not satisfied with the outcome of proceeding pro se in the face of a denial of his motion.

Since it is easy to lose sight of the question upon which relief in this case actually turns, it may be worth emphasizing that in the majority's analysis reversal ultimately depends upon whether the defendant was improperly denied substitute counsel. The majority reasons that if the defendant was entitled to, but was denied, a mistrial and substitution of appointed counsel, then his choice to proceed pro se was necessarily involuntary, amounting to a complete denial of counsel, a structural error requiring automatic reversal without regard to any showing of prejudice. In my view the majority errs, however, in holding that if appointed counsel indicated to the defendant their intent to undermine his prospective testimony, his trial rights were "impermissibly usurped," entitling him to replacement counsel.

Unlike the majority, I do not consider it within the power of counsel, through their conduct of a criminal trial, to deny or deprive a defendant of fundamental trial rights. Regardless of any conduct or concession of his counsel at trial, a defendant can be deprived of a trial right only by the court's failure to ensure that he is adequately informed of it or by denying him a voluntary choice to exercise it. While the denial of certain trial rights may, under some extreme circumstances, be tantamount to the entry of a guilty plea, the conduct of counsel alone cannot deny his client such rights. *Cf. Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (court wrongfully denied defendant the right of cross-examination and confrontation where agreement to truncate

trial procedures was entered without defendant's consent).

Similarly, as long as the defendant is made to understand the nature and consequences of his right to testify, including its personal nature, *see People v. Curtis,* 681 P.2d 504, 514 (Colo.1984), and he is permitted to take the stand and testify freely upon choosing to do so, he has not been deprived of this fundamental right, regardless of the subsequent arguments of counsel. The performance of counsel relative to his client's testimony may well fall below the standard of reasonably competent representation and may in fact prejudice his client's interests, but I believe counsel's choice of tactics at trial implicates the effectiveness of his assistance—not his client's right to testify. Should counsel make unreasonable tactical decisions having an adverse impact on the outcome, a remedy for that conduct is separately available. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Furthermore, even though trial courts necessarily retain discretion to order the substitution of appointed counsel in order to avoid the likelihood of future mistrials or reversals (regardless of the defendant's wishes), *see Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("[T]he district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."); *People v. Frisco,* 119 P.3d 1093, 1095 (Colo.2005) (same), a criminal defendant is *entitled* to the replacement of appointed counsel only when it can be determined that his current counsel will be unable, under the circumstances, to provide effective assistance, *see* 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.4(b), at 704 (3d ed. 2007) ("Defendant must have some well founded reason for believing that the appointed attorney cannot or will not competently represent him."); *People v. Arguello,* 772 P.2d 87, 94 (Colo.1989). While various courts (including this one) have dis-

cussed a trial court's discretion to replace appointed counsel in terms of a complete breakdown in communications, *see, e.g., Arguello*, 772 P.2d at 94, the United States Supreme Court has made abundantly clear that indigent defendants are entitled only to effective assistance, without choice concerning any particular counsel, *see United States v. Gonzalez–Lopez*, 548 U.S. 140, 151, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), and that an "inferential approach" to determining whether an indigent defendant's right to effective assistance has been violated is limited to circumstances that "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Short of demonstrating a complete failure to subject the prosecution's case to meaningful adversarial testing or an actual conflict of interest, which necessarily evidences counsel's divided loyalties, a defendant who has appointed counsel at all critical stages can claim ineffective assistance only by pointing to specific errors in the proceedings and demonstrating their materiality with regard to the outcome. *Id.* at 659 n. 26, 104 S.Ct. 2039. Accordingly, the Supreme Court has only recognized an entitlement to substitute counsel when counsel is actively representing conflicting interests and objects to continued representation. *See Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). I believe the majority errs by creating a new entitlement to replacement counsel, even after jeopardy has attached, that is completely unrelated to the standard for effective assistance.

Beyond what I consider to be an error in the analysis, however, I am concerned that the majority's rationale dangerously places in the hands of criminal defendants a powerful tool to replace appointed counsel virtually at will; to control or delay proceedings to their advantage; and generally to whipsaw courts attempting to balance competing interests while effectively managing crowded dockets. Once they have been cut loose from any mooring in constitutional materiality, it is difficult to fathom the precise contours of terms like "completely contradict" or "wholly undermine" or how a trial court could possibly be expected to decide when trial tactics or the intentions of defendants and their counsel have become so solidified as no longer to be subject to modification. And even if these ill-defined concepts could provide a sufficiently determinable standard for reliable decision-making, the majority's requirement for courts to intercede in the attorney-client relationship sufficiently to appreciate subtle differences between the vacillating intentions of defendants and their counsel, would, in and of itself, be intolerable.

Aside from permitting the trial court to determine whether the defendant's failure to sooner request a substitution of counsel was his own fault, the majority's remand appears to entitle the defendant to a retrial without any likelihood of substandard attorney performance and adverse impact. There was clearly method in the Supreme Court's decision not to simply limit the remedy for a violation of effective assistance but to define the constitutional right itself in terms of substandard performance having an adverse impact. *See Mickens v. Taylor*, 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *Strickland*, 466 U.S. at 686–87, 104 S.Ct. 2052; *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039. In a case such as this, in which the defendant's claim of self-defense would be contradicted by the discovery of only one firearm at the scene and physical evidence establishing beyond all doubt that the defendant shot his former girlfriend at least three times and her boyfriend six times, it would be difficult to contend with a straight face that the defendant would be prejudiced by his counsel's attempt to lay some foundation for an alternate explanation of his proposed testimony or that such conduct would amount to substandard performance.

I find nothing in the Federal Constitution, or in the jurisprudence of either the United States Supreme Court or this court, suggesting a right to the appointment of counsel who will "accommodate," or investigate further, such a preposterous claim. To the extent the Supreme Court has entertained the question at all, it appears to have firmly rejected any suggestion that tactical concessions of guilt to a trier of fact are reserved for the defendant himself. *See Florida v. Nixon*, 543 U.S.

175, 189, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (attorney was not "required to gain express consent before conceding [the defendant's] guilt").

I would therefore simply reverse the judgment of the court of appeals and remand to that court for consideration of any remaining assignments of error.

I am authorized to state that Justice RICE and Justice EID join in this dissent.