22CA2253 Peo v Frazier 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2253
El Paso County District Court No. 22CR829
Honorable Gilbert A. Martinez, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

David Frazier,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GRAHAM
J. Jones and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, David Frazier, appeals his convictions on two counts of second degree assault and on one count each of menacing, kidnapping, extortion, and robbery.  We affirm.

I.    Background

¶ 2    The following summary of events is drawn from record testimony.  Although Frazier disagrees with the chronology, it is supported by the record.

¶ 3    Frazier and the victim, S.R., met through a dating app in December 2021.  By the end of the month, they had moved in together and were engaged.  At trial, S.R. testified that the relationship started well but that Frazier became abusive after she moved in.  The first incident occurred on January 9, 2022, after an argument when Frazier placed his hands on S.R.'s neck and strangled her until a roommate intervened.  S.R.'s work supervisor testified that she noticed the marks on S.R.'s neck.  Then on February 1, a second argument resulted in Frazier shoving her into a massage chair.  S.R. then went to the bedroom to pack her bags and leave the home.  But before she finished packing, Frazier got a gun and pointed it at her before unloading it and setting it on the bed within his reach.

¶ 4    The next day, S.R. planned to leave without Frazier knowing.[1] However, he noticed that she had packed a hair straightener in her work bag, which made him suspicious, so, while armed, he followed her to her car, got in it, and placed the firearm in the central console.  S.R. told him that she was leaving him and asked him to get out of the car.  He refused and rode with her to work.  Once there, he yanked the keys from her hand, cutting her fingers, and told her that if she didn't quit, she'd never work again.  He then followed her into her workplace and stood by her as she resigned.  The two returned to the car and Frazier, armed with the gun, told her to drive.  She drove for approximately forty-five minutes while he held the firearm and directed her.

¶ 5    Returning home, they sat in the car and talked for hours.  During that time, Frazier gave S.R. the gun and told her to shoot him, but she refused.  Eventually, they returned to their apartment.  Once inside, Frazier went with S.R. to the bedroom.  He then grabbed her, held her down on the bed, and made her swear that she would not leave him.  S.R. complied, and he released her.  Later

---

[1] Frazier disputes that S.R. accurately recounted the date of the February 2 incident.  The record does not support his argument.

that day, S.R. returned to work and rescinded her resignation. A few days later, during an argument about cigarettes, Frazier headbutted S.R., bruising her nose and chest and cutting his own head.

¶ 6    The abuse escalated further on or about February 8.[2] After realizing that S.R. had the phone number of one of his friend in her contacts, Frazier became extremely upset and accused her of cheating. He had taken her debit card and demanded that she transfer money from her second bank account into her checking account, so he could use the money at a strip club. S.R. refused, and Frazier's money demands and threats escalated, as described more fully in Part II.E.1 below. S.R. eventually gave in to his demands and transferred approximately $60,000 into the checking account and $1,500 directly to one of Frazier's friends.

¶ 7    To appease him, and to seek a public place, S.R. then suggested they go to the strip club together. That night, she recovered her debit card after it fell from his pocket, and the next

_____

[2] The record is unclear about exactly when this incident occurred. S.R. testified that it occurred on February 8 but also said that the next day was February 9 or 10. Regardless, the testimony shows that this incident occurred between February 6 and 10.

day at work, she called the police. Frazier was subsequently arrested and charged with twenty-one counts stemming from these domestic violence incidents. The prosecution narrowed the charges to eight before trial, and he was ultimately convicted of six counts and acquitted of two, both of which were misdemeanors. The court sentenced him to forty years in the custody of the Department of Corrections.

## II. Analysis

¶ 8 Frazier contends that reversal is required because (1) the trial court failed to conduct an inquiry under *People v. Arguello*, 772 P.2d 87 (Colo. 1989), and *People v. Bergerud*, 223 P.3d 686 (Colo. 2010), after he repeatedly interrupted the prosecutor's closing argument, resulting in the court removing him from the courtroom; (2) the trial court erroneously admitted evidence; (3) the prosecutors committed misconduct during closing argument; (4) the foregoing errors amount to cumulative error; and (5) there was insufficient evidence to sustain his robbery conviction. We address each contention in turn.

A.    Required Inquiries under *Arguello* and *Bergerud*

¶ 9    Frazier argues that the trial court erred by removing him from the courtroom — without conducting any inquiry under *Arguello* and *Bergerud* — after Frazier asserted his innocence during the prosecutor's closing argument and fired his attorney in front of the jury. We disagree.

1.    Additional Background

¶ 10    Frazier's first attorney was a public defender, but that attorney withdrew based on an irreconcilable conflict of interest. The court then appointed alternate defense counsel to represent him.

¶ 11    When the prosecutor began closing argument, Frazier interrupted her and — in front of the jury — told the court that there was evidence proving his innocence that had not been presented to the jury. The court excused the jury from the room, reminded Frazier that he had chosen not to testify, and warned him that he would be removed from the courtroom if he made statements in front of the jury. The jury returned, and not long after, Frazier interrupted again. The following exchange occurred.

> [FRAZIER]: They're lying, Your Honor. I'm in custody. She quit her job.

[THE PROSECUTOR]: They drove around from 6:45 --

THE COURT: Sir, no statements.

[FRAZIER]: She quit her job.

THE COURT: Sir, no statements.

[FRAZIER]: From what I knew --

[SECOND PROSECUTOR]: Your Honor, I ask the jury be excused during the outburst.

THE COURT: I don't want any more statements, sir, period.

[FRAZIER]: Based off procedural law --

THE COURT: No.

[FRAZIER]: I want a motion to suppress all evidence.  All of the discovery and charges --

THE COURT: If the jury would be excused again, please.

[FRAZIER]: -- free --

([Frazier] continued to talk unintelligibly.)

(The jury left the courtroom.)

[FRAZIER]: -- I'm in custody, Your Honor.  I'm locked up right now.  And she's free, and they're not getting the full evidence.  I told you all about the full evidence since I had this case, and no one is going to get it.  No one came to ask me nothing.  Y'all just came and arrested me off of what she said.  This is not fair, and you don't even call my family back.

THE COURT: I'm going to give you one more chance. All right? I'm going to ask you again not to make any statements. If you make one more statement again, I'm going to have you removed from the courtroom and we're going to proceed with closings. It's up to you. Are you going to make some more outbursts? It's up to you, sir. Are you going to have more outbursts, or not? I'm talking to you, Mr. Frazier.

All right. You have fair warning. You've had two outbursts. I'm letting you go with two. If you have one more outburst, I'm going to excuse the jury, and I'm going to have you excused because we're going to proceed to closings with or without you. One more chance, and that's it.

Go ahead and get the jury. You get one more, chance, sir, and that's it. We'll proceed with or without you.

(The jury entered the courtroom.)

¶ 12 The prosecutor continued with closing argument for a moment before Frazier interrupted again.

[FRAZIER]: I need to talk to counsel, my lawyer that I fired.

THE COURT: If the jury can please leave the courtroom again.

[FRAZIER]: The lawyer that I fired, I showed all my information.

(The jury left the courtroom.)

7

THE COURT: The record should reflect the jurors have left the courtroom. If court and transport will take [Frazier] to the holding cell, please.

[DEFENSE ATTORNEY]: We've got several issues now before he goes that we need to discuss.

THE COURT: Go ahead.

[DEFENSE ATTORNEY]: We've got several issues now. There's been a couple -- for lack of a better word, we've had several outbursts. He told the jury he's in custody. I think there might be a basis for a mistrial because of the outbursts. And he raised an issue of ineffective assistance of counsel, and he fired me in front of the jury. So I think we probably need to deal with that at this point.

THE COURT: How would you suggest we deal with it?

[DEFENSE ATTORNEY]: I -- I don't know. I mean, I think he can fire his attorney at this point. I know you have to accept it.

THE COURT: . . . I'm not going to accept the firing and have you go to closing.

[DEFENSE ATTORNEY]: Okay. And I'm prepared for that. I'm just . . .

THE COURT: Also, in regard to the mistrial -- well, any response from the district attorney?

[SECOND PROSECUTOR]: We obviously resist[] any motion for a mistrial. This is all

8

[Frazier's] own doing, so there's no grounds for a mistrial.

THE COURT: In regard to the mistrial, I'm going to deny the grounds for a mistrial. The record should reflect I did give [Frazier] an opportunity to not talk, not outburst. I warned him if he was going to have an outburst, that indeed I would have him taken into -- and proceed to closings with or without him. He's chosen to have an outburst again, so I'm going to proceed to closing without him. Is there any instruction you wish me to give the jury once they come back in regard to [Frazier] not being in the courtroom?

[DEFENSE ATTORNEY]: I've never had this happen, Your Honor. I don't know what instruction there would be. Have you?

THE COURT: I would suggest that we advise the jury that we're going to proceed to closing without the Defendant in the courtroom, and they should not hold that against him.

The court held the remainder of the closing arguments in Frazier's absence.

¶ 13    After the jury returned its verdicts, Frazier filed a handwritten motion with the trial court describing his disagreements with his counsel, perceived ethical breaches, and his complaints with the presentation of evidence at trial. The court held a hearing the next week to address his concerns. At the hearing, the court heard Frazier's complaints, which were primarily directed toward his

attorney's failure to conduct further investigation, provide discovery, and secure witnesses on his behalf. His counsel explained that he had provided Frazier with all discovery materials and said that, because Frazier "said he was ready and wasn't waiving [the] speedy trial [deadline]," he could not do any additional investigation. The court did not find a conflict of interest or breakdown in communication, but, nevertheless, it allowed his counsel to withdraw and appointed new alternate defense counsel.

2. Applicable Law and Standard of Review

¶ 14 A criminal defendant has a constitutional right to be present for all critical stages of the trial. U.S. Const. amend. VI; *People v. Janis*, 2018 CO 89, ¶ 16; *see also* Crim. P. 43. However, "the right to be present is not absolute. A defendant may waive [his] right to be present either expressly or through [his] conduct." *Janis*, ¶ 17; *see also* Crim. P. 43.

¶ 15 "[T]he denial of a defendant's request for new counsel should be reviewed for abuse of discretion." *Bergerud*, 223 P.3d at 696 n.4. And we review a preserved claim of the erroneous denial of a request for new counsel and requirement to proceed with a

court-appointed attorney "under principles of harmless error." *Id.* at 696.

### 3. The Trial Court Did Not Abuse Its Discretion by Removing Frazier Without an *Arguello* Advisement or *Bergerud* Inquiry

¶ 16 Frazier argues that after his third outburst during closing argument, the trial court was required to inquire and advise him under *Arguello* and *Bergerud.*

¶ 17 In *Arguello,* the court "granted certiorari to clarify what standard applies in evaluating the validity of a waiver of the right to counsel, and to determine whether [the defendant] through his conduct impliedly waived his right to counsel." 772 P.2d at 92.

¶ 18 Our review of the record does not demonstrate that Frazier sought to waive his right to counsel. Nor is it clear from the record that Frazier actually voiced objections to his counsel to the court. In fact, after closing arguments, the court said that "the [d]efense attorney made the statement that he was fired. I didn't hear that, but I'll take him for his word."

¶ 19 To be sure, the record shows that Frazier said, "I need to talk to counsel, my lawyer that I fired," and after the court removed Frazier, his counsel said that "he raised an issue of ineffective

11

assistance of counsel, and he fired me in front of the jury."
However, the record before us does not contain the actual firing or
an assertion of ineffective assistance of counsel. And at the
post-trial conflict hearing, the trial court did not find a conflict of
interest or breakdown in communications; instead, it simply
allowed his counsel to withdraw.

¶ 20    And to the extent that *Bergerud* was implicated by the firing
statements, application of its four-factor test to evaluate a request
for new counsel heavily favors the trial court's determination.[3]
First, Frazier waited to raise his unclear objection to his counsel
until after the close of evidence, during the prosecutor's closing
argument. Second, while the court made clear that counsel would
proceed through the remaining argument, it held a post-trial
hearing and inquiry on the issue and did not find a conflict of

---

[3] To measure the constitutional implications of a defendant's
request for new counsel, we inquire into (1) the timeliness of the
motion; (2) the adequacy of the court's inquiry into the defendant's
complaint; (3) whether the attorney-client conflict is so great that it
resulted in a total lack of communication or otherwise prevented an
adequate defense; and (4) the extent to which the defendant
substantially and unreasonably contributed to the underlying
conflict with his attorney. *People v. Bergerud*, 223 P.3d 686, 695
(Colo. 2010).

interest.  Third, the record supports a conclusion that there was no conflict "so great that it resulted in a total lack of communication or otherwise prevented an adequate defense."  *Bergerud*, 223 P.3d at 695.  And fourth, Frazier substantially and unreasonably ignored the trial court's warnings in such a way as to suggest that he was lodging his vague objection "to unnecessarily delay the judicial process."  *Id.*  Thus, the trial court did not abuse its discretion by failing to stop the trial and provide Frazier with new counsel, which, as the court noted, would have required a mistrial.

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.  The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.  We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.  No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.

*Illinois v. Allen*, 397 U.S. 337, 343 (1970).

¶ 21    Here, when faced with an obstreperous defendant who had thrice interrupted the prosecutor's closing and received two warnings, the trial court acted within its discretion and removed

him from the courtroom. *See People v. Cohn*, 160 P.3d 336, 341 (Colo. App. 2007) ("[A] defendant is deemed to have waived his right to be present if, '[a]fter being warned by the court that disruptive conduct will cause him to be removed from the courtroom, [the defendant] persists in conduct which is such as to justify in his being excluded from the courtroom.'" (quoting Crim. P. 43(b)(2))). Under these circumstances we discern no error in the trial court's failure to conduct an *Arguello* inquiry or a *Bergerud* inquiry before removing Frazier from the courtroom.

## B.     Evidentiary Contentions

¶ 22     Frazier contends that the trial court erred by admitting (1) victim impact evidence; (2) evidence of other bad acts; and (3) expert testimony in the guise of lay testimony. We disagree with each contention.

### 1.     Preservation and Standard of Review

¶ 23     The People argue that Frazier failed to preserve his evidentiary arguments for appeal. We agree in part.

¶ 24     "To preserve a claim, a party must make an objection 'specific enough to draw the trial court's attention to the asserted error.'" *People v. Tallent*, 2021 CO 68, ¶ 12 (quoting *Martinez v. People*,

14

2015 CO 16, ¶ 14).  When a party presents a new argument or alters the grounds for an objection on appeal, the issue is forfeited and reviewable only for plain error.  *Id.*

¶ 25    Frazier's counsel objected to testimony from S.R. as being unduly prejudicial and subsequently objected to similar testimony from one of her coworkers, but he did not object to later testimony from a second coworker.  His objection to the first coworker's testimony was based on speculation and prejudice, and he did not specifically argue to the court that it was impermissible victim impact evidence.  But Frazier argues on appeal that the coworker's objected-to testimony should have been barred under CRE 403 because its probative value was substantially outweighed by the danger of unfair prejudice; this issue is preserved.  We conclude that Frazier's assertion of prejudice, vague though it may have been, was substantial enough to include victim impact.

¶ 26    The remainder of Frazier's evidentiary arguments are unpreserved because his attorney did not object with specificity or because Frazier advances new grounds for objection on appeal.  *See People v. Snelling,* 2022 COA 116M, ¶¶ 33-34.

¶ 27    We review evidentiary rulings for an abuse of discretion. *People v. Garrison*, 2017 COA 107, ¶ 30. And we review claims of nonconstitutional trial error that were preserved by objection for harmless error. *Hagos v. People*, 2012 CO 63, ¶ 12. However, we review all other claims of error, constitutional and nonconstitutional, that were not preserved by objection for plain error. *Id.* at ¶ 14. In doing so, we reverse only if the error was obvious and substantial. *Id.*

¶ 28    "An error is 'obvious' if it is so clear cut that the judge should have been able to avoid it without the benefit of an objection." *People v. Rojas*, 2025 COA 25, ¶ 44. An error is substantial if it "so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 22; *see also Rojas*, ¶ 44.

### 2.    Victim Impact Evidence

¶ 29    At trial, the victim testified that she had post-traumatic stress, anxiety, and depression, and that she had missed work, lost hair, lost focus, and needed psychological help due to Frazier's actions. Frazier's counsel objected regarding a lack of medical records, and the trial court effectively sustained the objection by saying, "Let's

16

move on." *See People v. Carian*, 2017 COA 106, ¶¶ 63-64 (telling the prosecutor to "stay away" from the line of questioning effectively sustained an objection and cured any potential prejudice). While this somewhat ambiguous statement is not the preferred ruling on an objection, in context the trial court's statement effectively prohibited further inquiry about S.R.'s mental health and diagnoses from the prosecutor.

¶ 30    Frazier argues, citing *People v. Martinez*, 2020 COA 141, ¶ 40, that the victim impact testimony was irrelevant and that its sole function was to garner sympathy for S.R. But his argument fails to account for the substantial evidence of guilt that was presented to the jury. Thus, any error in allowing the testimony was, in our view, harmless given the other, overwhelming evidence of guilt.

¶ 31    The numerous incidents of abuse spanned a considerable amount of time. *See People v. Dunlap*, 975 P.2d 723, 744-46 (Colo. 1999). And, unlike in *Martinez*, ¶ 40, this was not a case where "the victim impact evidence [did not make] any material fact or element of the offense more or less probable." Instead, S.R.'s and her coworkers' testimony was relevant. S.R.'s testimony explained her and Frazier's relationship, Frazier's actions over time, her

reluctance to call the police, and the control that Frazier had over her.  Likewise, S.R.'s coworkers' testimony corroborated S.R.'s story and showed the control Frazier had over her.  Their testimony was particularly probative considering Frazier's theory of the case was that S.R. fabricated the abuse.

### 3.    Other-Acts Evidence

¶ 32    Frazier contends that the trial court erred by admitting testimony that (1) one of Frazier's friends was his drug dealer; (2) there were other uncharged incidents of domestic abuse; and (3) the Colorado Springs Police failed to investigate other incidents. He argues that this testimony constituted other-acts evidence and that the trial court failed to conduct the necessary CRE 404(b) analyses.

¶ 33    Under Rule 404(b), subject to limited exceptions, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  And "Rule 404(b)(3) requires that, in criminal cases, the prosecution provide the court and the defendant with reasonable notice of its intent to introduce

other-acts evidence in writing before the trial." *Rojas v. People*, 2022 CO 8, ¶ 26.

¶ 34    First, at trial, S.R. — in response to a question from the prosecutor about why Frazier's friend gave her his number — testified that the friend "was [Frazier's] coke dealer, and he was in the vehicle and was able to calm him down." Frazier's counsel immediately requested a bench conference and moved for a mistrial, which the court denied. However, Frazier's counsel did not ask for the trial court to strike the testimony from the record or to instruct the jurors to disregard it. On appeal, Frazier argues that the court erroneously admitted the evidence and failed to strike it from the record.

¶ 35    Contrary to Frazier's argument, the statement that the friend was Frazier's cocaine dealer was fleeting, and the court immediately instructed the prosecutor to "go to a different area." Additionally, this statement was not inadmissible "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). Instead, it was largely irrelevant, albeit a bit prejudicial, evidence that showed how S.R. knew someone.

19

¶ 36     We also note that the jury heard testimony, not challenged on appeal, that S.R. stole opiates and oxycodone and, under duress, used the drugs with Frazier.  This evidence tended to paint S.R. and Frazier with the same brush.  A momentary further reference to a friend who sold Frazier drugs did not further besmirch his character or so undermine "the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction."  *Hagos*, ¶ 22.

¶ 37     Second, on cross-examination, Frazier's attorney asked S.R., "How many domestic violence incidents were there?" and, after saying he did not understand her testimony about "all this other stuff," "How many incidents were there?"  S.R. testified specifically to the five charged domestic violence incidents that formed the basis for the eight charges brought against Frazier.  But after she recounted the specific events, she said, "So I would say anywhere from eight to ten incidents."  Frazier's attorney did not object to his own question and instead pressed S.R. on why she did not call the police but instead purchased a firearm for herself.  On appeal, Frazier argues that S.R.'s "eight to ten incidents" statement was impermissible other-acts testimony.

¶ 38    However, Frazier's counsel invited any error from S.R.'s response of "eight to ten incidents" by specifically asking about the number of incidents. *See People v. Shackelford*, 511 P.2d 19, 20 (Colo. 1973) (holding that it was invited error for defense counsel to ask open-ended questions on cross-examination that resulted in an undesirable response). Therefore, Frazier's contention is barred by the invited error doctrine. *See People v. Wittrein*, 221 P.3d 1076, 1082 (Colo. 2009) ("Under our invited error doctrine, 'a party may not complain on appeal of an error that he has invited or injected into the case; he must abide the consequences of his acts.'" (quoting *People v. Zapata*, 779 P.2d 1307, 1309 (Colo. 1989))).

¶ 39    But even if this error was not invited, and assuming without deciding that the testimony was subject to Rule 404(b)'s other-acts framework, its admission was not plain error. The statement was a single fleeting reference, elicited by Frazier's counsel, and used to undermine S.R.'s own credibility. "An ambiguous reference to a defendant's prior criminal misconduct or other bad acts does not warrant a mistrial. Moreover, when a reference to improper conduct is fleeting, as it was here . . . , the potential prejudice is minimized." *People v. Compos*, 2019 COA 177, ¶ 37 (citations

21

omitted), *aff'd in part and vacated in part*, 2021 CO 19; *see also People v. Salas*, 2017 COA 63, ¶ 12; *People v. Lahr*, 2013 COA 57, ¶¶ 24, 27. Thus, S.R.'s statement did not so undermine "the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 22.

¶ 40 Third, in response to a jury question about why the Colorado Springs Police Department did not work together with the El Paso County Sheriff's Office, Deputy Zach Lacey testified as follows:

> So the reason as far as jurisdictional boundaries go, we run into what's called joinder issues. If two different agencies investigate potentially -- or if two different agencies investigate a crime that occurred in the opposite agency's jurisdiction, we run into what's called a joinder issue. So how they kind of divide that up is CSPD will take the portion that happened in their jurisdiction only, and then we take the portion that happened in our jurisdiction only, versus both of us investigating it together. That's why we do that.

The prosecutor then asked,

> And in this case was there a reason that you took over the entire investigation and I guess let CSPD off the hook?
>
> [DEPUTY LACEY:] No, not specifically -- not specific reason, no. I guess I had assumed, and shame on me, that they were still

22

investigating the portion that happened on their half and I was investigating the portion that happened on my half, but it appears that may not have been the case.

¶ 41   Frazier argues that Deputy Lacey's reference to "happened on their half" implied that other uncharged acts occurred and that his "shame on me" statement implied that these uncharged acts were important. And he asserts that this statement implicated Rule 404(b).

¶ 42   Contrary to Frazier's argument, Deputy Lacey's statements were not evidence of other crimes, wrongs, or acts, and did not trigger a Rule 404(b) analysis. Instead, his statement explained his investigation and the jurisdictional challenges he faced. And, even if this statement could be read as implicating impermissible other-acts testimony, any error in allowing the fleeting reference to "happened on their half" was not substantial. *See Compos*, ¶ 37.

### 4.   Expert Testimony in the Guise of Lay Testimony

¶ 43   Frazier contends that the trial court erred by allowing Deputy Lacey to testify that a mark on S.R.'s neck corroborated her story because that was expert testimony. We disagree.

¶ 44   The following exchange occurred on direct examination:

Q.  [PROSECUTOR:] Deputy, I'm handing you what's been marked as Exhibit 1.  Did you take that photograph?

A.  I did, yes.

Q.  And what is that a photograph of?

A. Those are the -- the markings on the back of her neck from the fingernails of the individual that allegedly strangled her.

Q.  Okay.  And it's tough to see on that photo.  Is there any bruising on the neck that you can see?

A.  Not that I can see, no.

Q.  Okay.  At that time had [S.R.] told you about an event involving strangulation?

A.  She did.

Q.  And did she tell you that there was an injury to the back of her neck?

A.  She did.

Q.  And the picture that you saw, does that corroborate what she told you?

[DEFENSE ATTORNEY]: I'm gonna object to speculation, Your Honor, and hearsay.

THE COURT: Objection is overruled.

Q.  [PROSECUTOR:] You can answer.

A.  Yes.

¶ 45    Then on cross-examination, Frazier's counsel asked the following clarifying question:

> Q: Okay.  So when you talk about corroboration, I mean, you're not here saying, yeah, this happened definitely, you're just kinda saying there's some mark where she said there might be a mark?
>
> A: That's accurate.

¶ 46    Contrary to Frazier's argument, Deputy Lacey's initial testimony did not require specialized training or education.  *See* CRE 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise.").  Taking the question in context, he was asked whether, when he took the photos, there were marks on S.R.'s neck as she said there were.  This testimony was not based on specialized knowledge; instead, it was based on his personal knowledge of what he saw and photographed, and was, therefore, lay testimony.  *See* CRE 701 ("If the witness is not testifying as an expert, the witness' testimony . . . is limited to those opinions or inferences which are (a) rationally based on the perception of the witness . . . .")

¶ 47    Frazier alternatively argues this testimony was irrelevant because, as a lay witness, Deputy Lacey was in the same position to view the photo as the jury. But this argument ignores the fact that Deputy Lacey was not just viewing the photograph; instead, he took the photograph and testified about what he saw at that time. The record shows that the photograph was somewhat unclear. Therefore, testimony from the photographer that there was no bruising visible in the photograph, but that there were fingernail marks present, was relevant and helpful to the jury. *See* CRE 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").[4]

¶ 48    Thus, the trial court did not err by permitting Deputy Lacey's testimony.

---

[4] Even if Deputy Lacey's lay testimony was irrelevant, any error in its admission does not cast serious doubt on the reliability of the judgment of conviction because — as Frazier argues — "[t]he jury had that picture" and "was in just as good a position to make that assessment." Under that line of reasoning, Deputy Lacey's testimony was duplicative, and it did not misrepresent the evidence presented to the jury.

26

## C.   Prosecutorial Misconduct

¶ 49   Frazier contends that the prosecutors committed misconduct during their closing arguments by (1) making an assertion about typical dynamics of domestic violence; (2) asserting personal knowledge; (3) asking the jury to hold Frazier accountable; and (4) suggesting that the police had screened the case to determine whether charges were warranted.  We disagree.

### 1.   Standard of Review and Applicable Law

¶ 50   Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005).  We review such claims using a two-step analysis: (1) was the prosecutor's conduct improper based on the totality of the circumstances, and, if so, (2) does any such improper conduct warrant reversal according to the proper standard of reversal. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  Each step is analytically independent of the other, and we can affirm on either step.  *Id.*

¶ 51   When, as here, a defendant did not object to the asserted misconduct, the plain error standard of review applies.

*Domingo-Gomez*, 125 P.3d at 1053. In the context of plain error, we "must inquire into whether the errors seriously affected the fairness or integrity of the trial." *Id.* And "[o]nly prosecutorial misconduct which is 'flagrantly, glaringly, or tremendously improper' warrants reversal." *Id.* (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

¶ 52     "We evaluate claims of improper argument 'in the context of the argument as a whole and in light of the evidence before the jury.'" *People v. Van Meter*, 2018 COA 13, ¶ 24 (quoting *People v. Geisendorfer*, 991 P.2d 308, 312 (Colo. App. 1999)). And we recognize that "[a] 'prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts.'" *Id.* (quoting *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010)).

### 2.     The Prosecutors' Statements Do Not Constitute Plain Error

¶ 53     Frazier asserts that five of the prosecutors' statements require reversal for plain error.

¶ 54     First, Frazier asserts that, without the support of expert testimony, the prosecutor improperly characterized S.R.'s demeanor

28

as "all the signs of someone who is under the control and manipulation of another person." However, this statement was tethered to the evidence presented at trial and was a reasonable inference drawn from that evidence. It was not improper. *See Domingo-Gomez*, 125 P.3d at 1048.

¶ 55 Second, Frazier argues that the prosecutor improperly injected his own knowledge of domestic violence and credibility into the case by saying "welcome to the world of domestic violence, folks. Did you expect it didn't happen behind closed doors? Did you expect to hear these things happened in front of other witnesses?" This statement was made on rebuttal in response to Frazier's argument, and prosecutors have "considerable latitude in replying to opposing counsel's arguments and in making arguments based on facts in evidence and reasonable inferences that can be drawn from those facts." *People v. Allgier*, 2018 COA 122, ¶ 52. Additionally, a prosecutor "may employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance, so long as he or she does not thereby induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose." *People v. Allee*,

29

77 P.3d 831, 837 (Colo. App. 2003). This statement, responding to argument and based on the evidence or lack thereof presented, was not improper.

¶ 56    Additionally, Frazier argues that the prosecutor asserted personal knowledge by saying that "[w]e know that" the kidnapping incident happened on February 1 or 2. This statement was directly based on the evidence presented at trial and was not improper. *See Domingo-Gomez*, 125 P.3d at 1048; *Allgier*, ¶ 52.

¶ 57    Third, Frazier asserts that during rebuttal argument, the prosecutor impermissibly asked the jury to hold Frazier accountable for going on the offensive against S.R. when she tried to leave him.[5] Again, a prosecutor has wide latitude to respond to opposing counsel's arguments, *Allgier*, ¶ 52, and may employ proper rhetorical devices and embellishments, *Allee*, 77 P.3d at 837. In the context of this case, and Frazier's counsel's argument that

---

[5] Frazier asserts that *People v. Buckner*, 2022 COA 14, ¶¶ 41-55, holds that a "prosecutor's plea to '[h]old the defendant accountable' was plain error." *Buckner* neither holds nor states this. Instead, *Buckner* holds that "[a] prosecutor may not pressure jurors to 'do justice' for a victim," *id.* at ¶ 42, and it reiterates that a prosecutor "may not 'pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim,'" *id.* at ¶ 44 (quoting *People v. Marko*, 2015 COA 139, ¶ 221).

S.R. went on the offensive against him, this statement was not improper.

¶ 58     Lastly, Frazier asserts that the prosecutor, in response to Frazier's counsel's argument that S.R. fabricated the allegation of violence, improperly asserted that a screening process occurred by saying,

> Does [a false accusation of domestic violence] happen?  Yeah, it does.  So how do we know it wasn't false?  In this case, the police investigated the crime and they found corroborating evidence of it, right?  This wasn't a case where the police went and said there's no evidence of it.

¶ 59     This statement's propriety is less clear cut than the prior four. However, assuming without deciding that this statement was improper, when viewed under the lens of plain error, any invocation of a screening procedure was not "flagrantly, glaringly, or tremendously improper." *Avila*, 944 P.2d at 676 (quoting *People v. Vialpando*, 804 P.2d 219, 224 (Colo. App. 1990)).  In the context of the trial and the evidence presented, *see Van Meter*, ¶ 24, the prosecutor's statements did not seriously affect the fairness or integrity of the trial or cast serious doubt on the reliability of the

31

jury's verdicts. Thus, the prosecutor's statements do not warrant reversal. *See Domingo-Gomez*, 125 P.3d at 1053.

### D. Cumulative Error

¶ 60 Frazier contends that under the cumulative error doctrine, a new trial is required because numerous errors occurred, and in the aggregate, they deprived him of a fair trial. We disagree.

¶ 61 The doctrine of cumulative error requires that numerous errors occurred, not merely that they were alleged. *People v. Daley*, 2021 COA 85, ¶ 141. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25 (citation omitted).

¶ 62 We have found, or assumed, a few errors. But we do not perceive their cumulative impact as denying Frazier his right to a fair trial. *See Martinez*, ¶ 89.

### E. Sufficiency of the Evidence of Robbery

¶ 63 Lastly, Frazier contends that there was insufficient evidence to support his robbery conviction. In doing so, he argues that the

prosecution failed to present evidence that he took anything of S.R.'s from "within her reach, inspection, or observation." We disagree.

### 1. Additional Background

¶ 64 As stated above, on or about February 8, 2022, Frazier had S.R.'s debit card and demanded that she transfer $1,000 from her second bank account — holding $180,000 in proceeds from a recent home sale — to her checking account tied to the debit card he could access. S.R. refused, and Frazier left the room and then returned with tape and bleach. He also had possession of her gun, but the trial testimony is unclear about exactly when during this incident he retrieved or brandished it. Frazier then demanded that she transfer $5,000 instead and threatened to pour bleach on her if she refused. S.R. refused.

¶ 65 Frazier then ordered her into the bathroom and raised his demand, now demanding that she transfer all the money. He then threatened to tie her up with the tape and douse her in bleach. A brief scuffle ensued, and, according to S.R., Frazier broke or stomped on her toe. S.R. ended up curled up in the bathtub in the fetal position while Frazier paced back and forth. And over the

course of hours, he stayed in the bathroom with her, making phone calls, while his threats escalated. Armed with the gun, tape, and bleach, he threatened that he would have his friends come over and gang rape her and said that he would kill her and no one would find her. S.R. eventually gave in, and Frazier made her — using her cell phone — electronically transfer approximately $60,000 into the account to which he had access and $1,500 directly to one of his friends through CashApp, a money transfer application.

¶ 66 Frazier then allowed S.R. out of the bathroom, directed her onto the living room couch, and told her she was going to give him every paycheck from her work and that he was going to hit her whenever he wanted. Then, at around 1 a.m., S.R. suggested that they go to a strip club together so that he would stay calm and she would be in a public place. They returned home around 4 a.m., and Frazier drove her to work at 6 a.m. S.R. testified that when Frazier drove her to work, he had her keys, wallet, and phone.

2. Applicable Law and Standard of Review

¶ 67 A person commits robbery if he "knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation." § 18-4-301(1), C.R.S. 2024. "The

34

elements of robbery involve (1) conduct — the use of force, threats, or intimidation; (2) circumstances — the thing must have value and must be taken from the person or presence of another; and (3) a result — the taking." *People v. Mortenson*, 2023 COA 92, ¶ 7.

¶ 68    We review de novo whether the prosecution presented sufficient evidence to sustain a conviction. *Maestas v. People*, 2019 CO 45, ¶ 13. In doing so, we employ a substantial evidence test, asking "whether the evidence, 'viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *Gorostieta v. People*, 2022 CO 41, ¶ 16 (quoting *People v. Harrison*, 2020 CO 57, ¶ 32). "[W]e must 'give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence.' It does not matter that we might have reached a different conclusion were we the triers of fact." *Id.* at ¶ 17 (quoting *Harrison*, ¶ 32).

### 3. There Is Sufficient Evidence to Support the Robbery Conviction

¶ 69    Frazier argues that to convict him of robbery, the prosecution had to prove he used force or threats to take "anything of value from the person or presence of another." § 18-4-301(1). And he asserts that the forced initiation of an electronic transfer did not remove anything of value from S.R.'s person or presence or take anything of value from "within [her] reach, inspection or observation." *Mortenson*, ¶ 8 (quoting *People v. Borghesi*, 66 P.3d 93, 103 (Colo. 2003)). Instead, he argues that the evidence only supported his conviction for extortion. *See* § 18-3-207 C.R.S. 2024. Frazier's argument misapprehends the intent of the robbery statute and the case law interpreting it.

¶ 70    "[O]ur robbery statutes are primarily intended to protect persons and not property." *Borghesi*, 66 P.3d at 101. And "[t]he gravamen of robbery is the application of physical force or intimidation against the victim at any time during the course of a transaction culminating in the taking of property from the victim's person or presence." *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983).

36

¶ 71    Presence is not limited to current physical contact. *See*

*Bartowsheski*, 661 P.2d at 244. Instead, "[f]or property to be in a

victim's 'presence,' the victim must be exercising, or have the right

to exercise, control over the item taken." *Mortenson*, ¶ 8 (quoting

*People v. Ridenour*, 878 P.2d 23, 27 (Colo. App. 1994)). And "[t]he

property must also 'be within the victim's *reach, inspection or*

*observation so that the victim would be able to retain control over the*

*property* but for the force or threat of force directed by the

perpetrator against the victim.'" *Id.* (emphasis altered) (quoting

*Borghesi*, 66 P.3d at 103). Thus, "[i]n the robbery context, the term

presence is not so much a matter of being in the same location as

the property as it is a matter of control." *People v. James*, 981 P.2d

637, 641 (Colo. App. 1998).

¶ 72    Here, S.R. had control over the second bank account — legally

and through her phone — and the mechanism of control was in her

physical presence. The evidence presented at trial demonstrated

that Frazier used violence, threats, and intimidation to force the

transfer of money that S.R. had the right to exercise control over

and that was within her observation, inspection, or control, and

that he took the money from her, both through the transfer to the

checking account and through the transfer to his friend. *See Mortenson*, ¶ 7. Thus, there was sufficient evidence to convict Frazier of robbery. *See People v. Phillips*, 219 P.3d 798, 800 (Colo. App. 2009) ("If there is evidence upon which the jury may reasonably infer an element of the crime, the evidence is sufficient to sustain that element."); § 18-4-301(1).

### III. Disposition

¶ 73 The judgment is affirmed.

JUDGE J. JONES and JUDGE MOULTRIE concur.