23CA1611 Peo v Sarabia-Martinez 05-28-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1611
City and County of Denver District Court No. 14CR10280
Honorable Edward D. Bronfin, Judge
Honorable Alex C. Myers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jose Ricardo Sarabia-Martinez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GOMEZ
Moultrie and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 28, 2026

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Tara Jorfald, Alternate Defense Counsel, Lakewood, Colorado; Jennifer Tuttle, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Jose Ricardo Sarabia-Martinez, appeals the judgment of conviction entered after a jury found him guilty of violations of the Colorado Organized Crime Control Act (COCCA) and other offenses stemming from a fraudulent mortgage scheme carried out by his family business.  He contends that the trial court erred by (1) rejecting his statute of limitations challenges to three of the charges and declining to submit those issues to the jury; and (2) denying his request for substitution of his court-appointed counsel.  We reject his contentions and affirm the judgment.

## I.     Background

¶ 2     Starting in 2003, Sarabia-Martinez and several of his family members ran a fraudulent mortgage scheme through Worldwide Mortgage, Inc., and other family-owned businesses (collectively, Worldwide) operating in the real estate, mortgage, and property management industries.  The scheme generally went like this:

- Worldwide would find a straw buyer to purchase a residential property and would secure a mortgage by making false representations on the loan application. Worldwide would handle the down payment and closing

process on the property.  The straw buyer would never take possession of the property or pay the mortgage.

- Worldwide would then find a second straw buyer to purchase the property from the first straw buyer at a significantly higher price.  Again, the straw buyer would secure a mortgage through false representations.  And again, Worldwide would handle the down payment and closing process.

- The proceeds from the second sale wouldn't go to the first straw buyer.  Instead, through a private payoff letter directing the title company to pay sale proceeds to someone else, the proceeds went into the bank account of one of Sarabia-Martinez's family members before being rerouted to Worldwide's bank account.

- The second straw buyer also wouldn't make the required mortgage payments, and the lender would eventually foreclose on the property.

¶ 3     The extent of this scheme was uncovered starting in October 2011, when Borrego Springs Bank (Borrego) submitted a hotline complaint followed by a suspicious activity report (SAR) with the

Small Business Administration (SBA). At that time, Worldwide had just defaulted on a $2.3 million loan taken out with Borrego and backed by the SBA to refinance Worldwide's office space in Denver.

¶ 4 The following April, after Borrego had foreclosed on Worldwide's loan, Borrego invited law enforcement agents to review the more than a hundred boxes of records left abandoned in Worldwide's Denver office space. The Colorado Bureau of Investigation (CBI), Federal Bureau of Investigation (FBI), and SBA then began evaluating the records, obtaining additional bank and title company records through grand jury subpoenas, and uncovering the mortgage fraud scheme with the help of mortgage and financial fraud specialists.

¶ 5 On September 18, 2014, a grand jury indicted Sarabia-Martinez and several of his family members for their respective roles in the scheme. Sarabia-Martinez was indicted on nineteen counts. As relevant here, counts 1 and 2 alleged violations of COCCA by conducting or participating in an enterprise through a pattern of racketeering activity and by conspiring to conduct or participate in an enterprise through a pattern of racketeering activity. *See* § 18-17-104(3)-(4), C.R.S. 2025. Those counts were based on sixty

predicate acts of bank fraud, forgery, theft, conspiracy to commit theft, criminal impersonation, and attempt to influence a public servant dating from 2003 to 2010. Count 18, alleging criminal impersonation, alleged that in 2003, Sarabia-Martinez "unlawfully, feloniously, and knowingly assumed a false or fictitious identity or capacity, namely: Efrain Rios, and in such identity or capacity did an act with intent to unlawfully gain a benefit for himself or another or to injure or defraud another." *See* § 18-5-113(1)(b)(III), C.R.S. 2025.

¶ 6    Following a trial in which Sarabia-Martinez represented himself, the jury found him guilty of the two COCCA violations, the criminal impersonation count, and six counts of forgery. This appeal followed.

## II.    Statute of Limitations

¶ 7    Sarabia-Martinez first contends that counts 1, 2, and 18 are barred by the statute of limitations. Thus, he argues, the trial court erred by denying his motion to dismiss those counts. Alternatively, he argues that the trial court erred by rejecting his request to submit the statute of limitations issues to the jury. We disagree.

## A. Additional Facts

¶ 8 Several times over the course of the case, Sarabia-Martinez moved to dismiss portions of the case — including counts 1, 2, and 18 — based on the statute of limitations. In his motions, he argued that, although the indictment alleged that the criminal conduct was discovered in October 2011, the State and the victims knew or with the exercise of reasonable diligence should have known of the facts establishing these crimes much earlier. He also requested jury instructions on the statute of limitations issues at trial.

¶ 9 The trial court denied the motions and rejected the proposed jury instructions.

## B. Relevant Legal Standards

¶ 10 A statute of limitations challenge in a criminal case presents an issue of subject matter jurisdiction. *People v. Butler*, 2017 COA 117, ¶ 14. We review such challenges de novo. *People v. Thompson*, 2017 COA 56, ¶ 80.

¶ 11 The limitations period for most felonies, including COCCA violations and criminal impersonation, is three years. *See* § 16-5-401(1)(a), C.R.S. 2025. When an offense is based on a series of acts performed at different times, the limitations period doesn't begin

until the last of the series of acts is committed. § 16-5-401(4). For the crimes at issue here, the limitations period begins to run "upon discovery of the criminal act." § 16-5-401(4.5)(h), (q).

¶ 12     "'[D]iscovery of the criminal act' . . . refers to the point at which the victim or the [S]tate knew or through the exercise of reasonable diligence should have known of the facts establishing the crime at issue . . . ." *People v. Cito*, 2012 COA 221, ¶ 31. In *Cito*, a division of this court applied this standard to charges of theft by deception based on allegations that an employee had obtained money from his employer for unused personal time when, in fact, he had used the personal time off and thus wasn't entitled to the money. *Id.* at ¶¶ 5-6. In that context, the division concluded that "discovery of the criminal act" required not just that the employer knew or should've known the employee *obtained* the money, but also that it knew or should've known about the *deception* through which the employee had obtained the money. *Id.* at ¶¶ 2, 31.

¶ 13     "If a trial court's jurisdiction depends on the resolution of disputed facts, the issue should be submitted to the jury with an appropriate instruction unless the 'uncontested facts

overwhelmingly support jurisdiction.'" *Butler*, ¶ 49 (quoting *People v. Cullen*, 695 P.2d 750, 751 (Colo. App. 1984)); *accord Cito*, ¶ 32.

¶ 14     We first address Sarabia-Martinez's challenge as it pertains to the two COCCA charges and then address his challenge as it pertains to the criminal impersonation charge.

### C.     COCCA Charges

¶ 15     Sarabia-Martinez contends that the three-year statute of limitations for counts 1 and 2 had already run by the time the indictment was filed on September 18, 2014.  Specifically, he asserts that had the State and Borrego exercised reasonable diligence, they would have discovered the facts establishing the COCCA violations before September 18, 2011.  We consider, in turn, his arguments regarding the State and regarding Borrego.

### 1.     The State

¶ 16     Sarabia-Martinez's argument concerning the State relates to an investigation conducted by the Colorado Department of Regulatory Agencies (DORA), on behalf of the Division of Real Estate, between 2009 and 2011.  Beginning in 2009, DORA investigated consumer complaints filed regarding Sarabia-Martinez's then wife, who was a licensed real estate agent subject to

regulation by the Division of Real Estate. That investigation broadened into a review of some of Worldwide's practices — primarily whether some of its agents were acting as mortgage loan originators without a proper license. During the investigation, DORA audited several Worldwide mortgage transaction files. An August 2011 investigative report indicated that Sarabia-Martinez's wife and other Worldwide agents might have received kickbacks for loan modifications, used falsified information to obtain loans, and engaged in regulatory violations. The investigative report recommended that the case be referred to law enforcement, but there's no evidence indicating that such a referral was ever made.

¶ 17    Sarabia-Martinez argues that, with diligence, the State could have learned of the facts establishing the COCCA violations because DORA had possession of some of the same information that later gave rise to the CBI, FBI, and SBA investigation.

¶ 18    The trial court dismissed this argument, explaining that the DORA inquiry "was not an investigation of [Sarabia-Martinez]; it was a regulatory matter." At another point, the court reasoned,

> The only way in the [c]ourt's view that anyone
> could reasonably have put together that a
> crime or crimes had been committed was with

8

the complete review of th[e] bank records to see what happened with the money. . . . [I]t wasn't until all of th[e] information came together [in the investigation by the CBI, FBI, and SBA] that one could reasonably put together the fact that there was an alleged enterprise, the role of Mr. Sarabia-Martinez's ex-wife, mother, father, two brothers in this enterprise, and . . . in the [c]ourt's view, there's been no evidence that would reasonably support a finding by a reasonable finder of fact that that did or could have occurred on or before September 18, 2011.

¶ 19    We agree with the trial court and conclude that the evidence regarding the DORA investigation does not support a finding that the State knew or should have known about the facts underlying Sarabia-Martinez's COCCA violations before September 2011. That investigation wasn't directed at Sarabia-Martinez, who wasn't a licensed real estate agent subject to the Division of Real Estate's purview; rather, it was directed at his wife, who was. It also wasn't looking for any potential mortgage fraud; instead, it was focused on licensure violations. Although investigators eventually suspected some legal violations by Sarabia-Martinez's wife and other Worldwide agents, none of those suspected violations touched on the extensive mortgage fraud scheme that was later uncovered. And although investigators noted that Worldwide appeared to be

9

buying residential properties and then reselling them at a profit, that in and of itself doesn't point to a mortgage fraud scheme.

¶ 20 Moreover, there is no evidence indicating that the files DORA investigators reviewed related to any of the properties at issue in this case. Yet even if DORA investigators had obtained and reviewed any of those files, that would not have been enough to grasp the mortgage fraud scheme and Sarabia-Martinez's role in it. In particular, a review of the mortgage files would not have revealed that the buyers were straw buyers recruited by Worldwide or that the proceeds of the resales from the first straw buyers were being routed away from those buyers and into Worldwide's accounts. As it is, it took many months for CBI, FBI, and SBA investigators to uncover the scheme, even with the help of specialized experts, troves of abandoned documents, and grand jury subpoena power.

¶ 21 Thus, as in *Cito*, discovery of the offenses required more than just awareness of some of the underlying facts; it required that the State knew or should've known that Sarabia-Martinez had violated COCCA by conducting or participating in an enterprise through a pattern of racketeering activity or by conspiring to do so. *See Cito*, ¶¶ 2, 31; § 18-17-104(3)-(4). This, in turn, would require sufficient

evidence to support findings that earlier on the State knew or should've known facts establishing that Sarabia-Martinez was — or was conspiring to be — part of an enterprise engaging in a mortgage fraud scheme by using straw buyers to generate fake profits from real estate sales and diverting those profits to the enterprise. Yet there simply was not enough evidence to support such findings.

¶ 22 We therefore agree with the trial court that the evidence regarding the DORA investigation doesn't support a statute of limitations defense to the COCCA counts. And because there are no disputed material facts on this issue, the court properly declined to instruct the jury on it. *See Butler*, ¶ 49.[1]

---

[1] Because we conclude that there isn't enough evidence to support findings that DORA investigators discovered the COCCA offenses at the time of their investigation, we decline to address the broader issue of whether knowledge by a state regulatory agency like DORA can be imputed to a state prosecuting authority. We also decline to consider Sarabia-Martinez's assertion that the trial court should've instructed the jury that it could make an adverse inference based on the destruction of documents from DORA's investigation in determining when the statute of limitations began to run. Because the statute of limitations issue didn't need to go to the jury, and because nothing in the record suggests that the missing documents might have supported a different conclusion on the statute of limitations issue, that assertion is moot. *See People v. O'Day*, 2022 COA 24, ¶ 1 n.1 (declining to consider an issue that had been rendered moot).

## 2. Borrego

¶ 23    Sarabia-Martinez's argument concerning Borrego relates to the information the bank knew or with reasonable diligence could've known in the months preceding its October 2011 hotline tip and submission of the SAR.

¶ 24    In the last few months of 2010, Worldwide pursued the $2.3 million loan with Borrego to refinance a pre-existing loan with Paul Gatchis on its Denver office space. At the time, Worldwide was struggling to make payments on the loan with Gatchis, who had started foreclosure proceedings.

¶ 25    In November 2010, in conjunction with the loan approval process, Borrego received a loan verification form purportedly filled out and signed by Gatchis. That form indicated that the loan was not past due and had "never" been past due in the prior year. Gatchis, it seems, didn't actually fill out or sign the form.

¶ 26    A month later, in December 2010, the loan closed and the funds were disbursed. A representative of Borrego testified during this case that as part of a closing process, she would attempt to reach the lender or broker to verify a loan and that she made such inquiries to Gatchis but didn't recall receiving any response.

Gatchis testified that he never received any inquiries to verify the loan. But he also said he spoke with an attorney for Borrego around that time. He testified about that conversation as follows:

> Q.   Who first showed you [the loan verification form]?
>
> A.   We find out a month later when we're closing. The bank lawyer called me up. He says, "You didn't make any payments."
>
> . . . .
>
> Q.   So how did you first find out about this document that purportedly had your name on it?
>
> A.   The bank lawyer called me up [thirty] days later, and he told me, "You didn't make the payments for the note." I said, "Which note? I didn't borrow no money." And then I called a guy that he told me, and then I called the guy who verifies signatures, you know, tells you if it's your name or not. And he come to my home, and he told me to sign ten times.

¶ 27   Borrego later reported in its SAR that Worldwide missed payment in March 2011, and that Sarabia-Martinez said at the time that Worldwide had had some personnel changes and the missed payment was an oversight. Borrego requested some financial information from Worldwide and soon thereafter received the

13

missing payment but not the requested financial information. Regular payments resumed for a few months, but Worldwide missed another payment on August 15, 2011.

¶ 28    Borrego's SAR indicated that after that second missed payment, it made "[n]umerous attempts" to reach Worldwide by mail, phone, and email, but it received no response. It also conducted a site inspection and discovered that Worldwide's office was vacant. It filed a foreclosure action and attempted to serve Sarabia-Martinez, who was both Worldwide's principal and the guarantor on the loan. But on attempting to serve Sarabia-Martinez, Borrego's counsel learned that he was in jail after being accused of committing a crime of domestic violence on September 15, 2011.[2] Only then, Borrego stated, did it learn that Sarabia-Martinez had an extensive criminal record and that he had misrepresented that record on his statement of personal history form. Borrego also stated that upon further inquiry, it learned that the pre-existing loan had been the subject of foreclosure

---

[2] The record indicates that Sarabia-Martinez was arrested on September 24, 2011 for a domestic violence offense alleged to have been committed on September 15, 2011. The charge was dismissed a few months later.

proceedings earlier in 2020 and, thus, that the statements on the loan verification form regarding the currentness of the pre-existing loan were false. (At the time, Borrego reported Gatchis as a suspect for providing false information on the loan verification form.)

¶ 29  The SAR indicated that the suspicious activity took place from August 15 to early October 2011.

¶ 30  Sarabia-Martinez contends that Borrego became aware that the loan application contained a forged signature in December 2010 and should've been on notice of mortgage fraud when it was unable to reach Gatchis to verify the pre-existing loan. He also contends that Borrego became aware of the suspicious activity in August 2011, as alleged in the SAR, and thus at that point knew enough information to trigger the start of the limitations period.

¶ 31  Like the trial court, we reject these arguments. Contrary to Sarabia-Martinez's suggestion, Gatchis's confusing testimony does not indicate that Borrego became aware of any forgery on the loan verification form in December 2010. In his testimony, Gatchis referenced a lawyer for Borrego asking him why he hadn't made payments — which doesn't make sense because it was *Worldwide* that should've been making payments to *Gatchis* under the pre-

15

existing note. He also said he told the attorney he hadn't borrowed any money — which was true. And he referred to someone coming to his home to get him to sign documents — which doesn't signify anything as it relates to Borrego becoming aware of the mortgage fraud. More generally, the fact that Borrego agents hadn't been able to reach Gatchis during the loan verification process doesn't, by itself, suggest any mortgage fraud.

¶ 32 Moreover, as the trial court pointed out, the dates on the SAR form represented when the suspicious activity *occurred*, not when Borrego *discovered* the activity was suspicious. As the trial court also noted, there is no evidence indicating that at the time Borrego approved the loan, it was aware of the various misrepresentations in Sarabia-Martinez's personal history form, including, as investigators would later discover, that he was on probation at the time (despite representing that he wasn't) and that he had some outstanding liabilities such as back taxes and restitution (despite representing that he didn't).

¶ 33 Nor is there any evidence indicating that Borrego was aware of facts that would've suggested potential fraud at the time Worldwide missed its first payment in March 2011, or even after it missed a

payment again on August 15, 2011. The earliest Borrego may have had information suggesting potential fraudulent activity was when its attorney attempted to serve the foreclosure action on Sarabia-Martinez, learned he was in jail, and from there learned of his criminal record and misrepresentations on his personal history form — and that had to be on or after his September 24, 2011 arrest. Even then, it would take several months of investigation and the assistance of mortgage and financial fraud specialists to uncover the enterprise involved in the mortgage fraud scheme. Yet the indictment in this case was filed less than three years later, on September 18, 2014.

¶ 34    Again, as in *Cito*, it's not enough that Borrego may have been aware earlier of some of the facts underlying the charges; the statute of limitations didn't begin to run until it knew or should've known that Sarabia-Martinez had committed mortgage fraud regarding the Worldwide office loan as part of an enterprise engaging in a pattern of racketeering activity or conspiring to engage in such activity. *See Cito*, ¶¶ 2, 31; § 18-17-104(3)-(4). And there isn't enough evidence to support findings that it did.

¶ 35     Therefore, we agree with the trial court that the evidence regarding Borrego's loan doesn't support a statute of limitations defense to the COCCA counts.  And, again, because there are no disputed material facts on this issue, the court properly declined to instruct the jury on it.  *See Butler*, ¶ 49.[3]

### D.     Criminal Impersonation Charge

¶ 36     As to count 18 for criminal impersonation, Sarabia-Martinez contends that the three-year statute of limitations had already run by the time the grand jury indictment was filed in September 2014 because law enforcement officials were first aware that he was using false identification in 2003.  Again, we disagree.

¶ 37     In 2003, Sarabia-Martinez applied for and received a driver's license using the name "Efrain Rios."  He then used that driver's license to obtain a notary commission from the Colorado Secretary of State.  Investigators found the notary "Efrain Rios" on various

---

[3] At oral argument, counsel for Sarabia-Martinez argued that there was one disputed issue of material fact in this case — the question of exactly when Borrego's lawyer spoke with Gatchis.  But even construing that fact in Sarabia-Martinez's favor by assuming the conversation occurred in December 2010 or January 2011, that fact doesn't support a statute of limitations defense for the reasons we've explained.  Accordingly, the fact is not material.

documents they reviewed during their investigation and were able to trace the notary stamp to Sarabia-Martinez.

¶ 38   During traffic stops in 2003 and 2005, Sarabia-Martinez used the "Efrain Rios" driver's license. He pleaded guilty to two offenses related to providing that false identification.

¶ 39   Sarabia-Martinez contends that because law enforcement officials knew he was using false identification, the State would've known of the facts underlying count 18 had it exercised reasonable diligence. In particular, he asserts that after learning he was using false identification, law enforcement officials should've informed the Department of Motor Vehicles and the Secretary of State, which would have revealed the notary commission in the same name.

¶ 40   We agree, however, with the trial court's conclusion that "no evidence presented leads to the conclusion that the victims should or could have uncovered [Sarabia-Martinez]'s specific use of a fraudulent notary commission at an earlier date." Nothing during the traffic stops or related convictions would have given law enforcement officials reason to believe that the Secretary of State should be notified of the offenses or that Sarabia-Martinez had a notary commission under that same name. And informing the

Department of Motor Vehicles of the false identification wouldn't have uncovered the notary commission either.

¶ 41    It's also important to note that, consistent with the criminal impersonation statute, the indictment alleges that Sarabia-Martinez committed the offense by using a false identification "with intent to unlawfully gain a benefit for himself or another or to injure or defraud another." *See* § 18-5-113(1)(b)(III).  Even though law enforcement officials first discovered that Sarabia-Martinez was using false identification in 2003, there was no reason to know that he had also obtained a notary commission with that name and was using the commission in fraudulent transactions that he was profiting from.  *See Cito*, ¶¶ 2, 31.

¶ 42    Therefore, the facts establishing the criminal impersonation charge weren't discovered when law enforcement officials encountered Sarabia-Martinez using false identification in 2003 and 2005.  Accordingly, count 18 is not barred by the statute of limitations.  And because these facts aren't in dispute, the trial court didn't err by declining to have the jury determine when the statute of limitations began to run on that count.  *See Butler*, ¶ 49.

### III.   Substitution of Court-Appointed Counsel

¶ 43   Finally, Sarabia-Martinez contends that the trial court abused its discretion by denying his request for substitution of court-appointed counsel.  We aren't persuaded.

### A.   Additional Facts

¶ 44   A few days before trial, Sarabia-Martinez notified the trial court of a complaint he'd recently made about his two court-appointed attorneys to the Office of Attorney Regulation Counsel (OARC) for "failure or refusal to communicate with [him] about [his] case, failure to perform proper diligence, negligence, failure to investigate, and provide [him] with [an] adequate defense."

¶ 45   The day before trial, Sarabia-Martinez's counsel alerted the court that, in addition to the OARC complaint, Sarabia-Martinez had told his attorneys that he "either has or will be filing a lawsuit" against them.  Sarabia-Martinez then told the court that he wanted to discharge his attorneys.  The court referred the matter for a hearing under *People v. Bergerud*, 223 P.3d 686 (Colo. 2010).

¶ 46   At the *Bergerud* hearing, Sarabia-Martinez testified that communications with his attorneys had completely broken down. He said his attorneys didn't answer his calls or visit him when they

21

said they would; his attorneys didn't know the facts of his case, hadn't reached out to key witnesses, and weren't prepared for trial; and the three of them couldn't hold a conversation without arguing. Sarabia-Martinez thus asked for new appointed counsel.

¶ 47     In response, one of his defense attorneys said that "all of the statements that Mr. Sarabia-Martinez just made to the [c]ourt are pretty wrought with untruths." She reported that she and her co-counsel had spent substantial time preparing the case. She went on to say that their communications with Sarabia-Martinez had broken down but that it was "due to his actions and his actions alone" and related largely to his disagreements over whether they could pursue certain evidence or a statute of limitations defense at trial. Nonetheless, she said that she and her co-counsel were prepared to represent him at trial the next day.

¶ 48     The court observed that the case had been continued multiple times after an initial trial that was reversed on appeal for a new trial. It also observed that Sarabia-Martinez had already discharged his defense counsel twice since the remand, and it remarked that "the timing of all this is extraordinarily suspect." The court further remarked that "there was extensive activity and litigation on the

22

case since [the two current attorneys had] entered their appearances" and that the attorneys appeared to be providing "quite active and competent representation." It stated that the conflict between Sarabia-Martinez and his attorneys was largely over trial strategy, which remained the prerogative of his attorneys.

¶ 49 Ultimately, the court determined that the communications between Sarabia-Martinez and his counsel were broken down but not to the point that he was entitled to new appointed counsel. It also remarked that it "sound[ed] like the problem was [Sarabia-Martinez], not [his] lawyers." The court gave the attorneys the opportunity to withdraw, but one of them responded, "We are going to do our best to go to trial and represent Mr. Sarabia-Martinez and defend his constitutional right to a trial. And we will do it. I'm not happy about our relationship and the contentiousness[,] . . . [b]ut we stand ready and are willing to do it because it's our job."

¶ 50 When Sarabia-Martinez was denied substitute counsel, he decided to represent himself at trial.

## B. Relevant Legal Standards

¶ 51 We review a trial court's denial of a defendant's request for appointment of substitute counsel for an abuse of discretion.

23

*People v. Johnson*, 2016 COA 15, ¶ 29. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on a misapplication of the law. *People v. Rodriguez*, 2022 COA 98, ¶ 12.

¶ 52 A defendant isn't entitled to the appointment of substitute counsel absent a demonstration of good cause. *People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006). Good cause may include a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict, so long as the defendant has a well-founded reason to believe their counsel can't or won't provide competent representation. *People v. Krueger*, 2012 COA 80, ¶ 14.

¶ 53 In evaluating a trial court's decision to deny a defendant's motion for substitution of counsel, we consider four factors: (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; (3) whether the attorney-client conflict is so great that it resulted in a total lack of communication or otherwise prevented an adequate defense; and (4) the extent to which the defendant substantially or unreasonably contributed to the conflict. *Bergerud*, 223 P.3d at 695.

## C.	Application

¶ 54	Applying the four *Bergerud* factors, we conclude that the trial court didn't abuse its discretion by denying Sarabia-Martinez's request for court-appointed substitute counsel.

¶ 55	First, it was within the trial court's discretion to find the timing of Sarabia-Martinez's motion suspect. He didn't raise any concerns with these two attorneys until a few days before trial. And considering the repeated delays following the initial remand and the issues Sarabia-Martinez had had with prior counsel, the court had ample reason to suspect that Sarabia-Martinez was creating an issue with his counsel in an attempt to further delay the trial.

¶ 56	Second, the trial court adequately investigated Sarabia-Martinez's complaint. *See Johnson*, ¶ 30 (when a defendant raises an objection to court-appointed counsel, the court must investigate the reasons for the defendant's dissatisfaction). The court provided Sarabia-Martinez ample time to explain his qualms with his attorneys, asked questions to clarify what relief he wanted, and carefully considered his request.

¶ 57	Third, the record supports the trial court's conclusion that the attorney-client conflict was not so great that it would prevent an

adequate defense. True, there was a breakdown in communications between Sarabia-Martinez and his attorneys, but it was largely due to disagreement over trial strategy. As the court observed, "[T]here's disagreements as to what may or may not be admissible or what may or may not be relevant or what may or may not be a viable defense." And while a defendant has a constitutional right to an attorney and "remains ever the master of his defense," *Bergerud*, 223 P.3d at 693, defense counsel is the "captain of the ship" on issues of trial strategy, *id.* (quoting *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008)); *see also Krueger*, ¶ 14 ("Disagreements pertaining to matters of trial preparation, strategy, and tactics do not establish good cause for substitution of counsel." (quoting *Kelling*, 151 P.3d at 653)). Defense counsel also continually repeated that, despite the disagreements, they stood ready to go to trial and put on the best defense they could. And, contrary to Sarabia-Martinez's argument, nothing about defense counsel's statements at the *Bergerud* hearing about him or their conflict undercuts the trial court's finding that, despite the conflict, counsel would be able to adequately represent him at trial.

¶ 58    And fourth, the record also supports the trial court's

conclusion that Sarabia-Martinez substantially and unreasonably

contributed to the conflict with his attorneys.  The court credited

defense counsel's representation that they were adequately

prepared for trial and were willing to continue representing him,

and it concluded that Sarabia-Martinez appeared to be causing the

issues, potentially in an effort to further delay the trial.  *See*

*Bergerud*, 223 P.3d at 695 ("The first and fourth factors ensure that

a defendant does not use requests for new counsel to unnecessarily

delay the judicial process.").

¶ 59    Lastly, we reject Sarabia-Martinez's contention that his

attorneys could no longer represent him because of the conflict of

interest created by his OARC complaint and threatened lawsuit.

The court explored Sarabia-Martinez's complaints about his

attorneys and determined they weren't substantially justified.  The

court thus acted within its discretion by not allowing Sarabia-

Martinez to file unsubstantiated grievances against his attorneys

and then use those grievances to force a substitution of counsel.

*See People v. DeAtley*, 2014 CO 45, ¶ 30 (Coats, J., concurring in

part and dissenting in part) ("[F]iling an action against counsel and

demanding their discharge alone do not constitute good cause for substitution of counsel or require acquiescence in a motion to withdraw. It is for the trial court to determine, in the totality of circumstances, whether the defendant should be denied a continuance to retain new counsel, which determination necessarily includes an assessment whether good cause for substitute counsel actually exists."); *United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (rejecting a defendant's argument that his state bar grievance against his appointed attorney created a conflict of interest that precluded the attorney from adequately representing him, and expressing that "to hold otherwise on such unpersuasive facts would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial").

¶ 60    Accordingly, we discern no abuse of discretion in the trial court's decision not to appoint Sarabia-Martinez substitute counsel.

IV.    Disposition

¶ 61    The judgment is affirmed.

JUDGE MOULTRIE and JUDGE BERGER concur.